RAY B. LUCAS, Superintendent of the Insurance Department of the State of Missouri, Respondent, v. MANUFACTURING LUMBERMEN'S UNDERWRITERS, a Reciprocal Insurance Exchange et al., Defendants, CENTRAL SURETY & INSURANCE CORPORATION, a Corporation, and R. E. O'MALLEY, Appellants.—163 S. W. (2d) 750.

Division Two, May 5, 1942.

Rehearing Denied, June 17, 1942.

Motion to Transfer to Banc Overruled, July 28, 1942.

*James P. Aylward, George V. Aylward* and *Terence M. O'Brien* for appellant R. E. O'Malley.

*McCune, Caldwell, Downing & Noble, R. B. Caldwell, H. M. Noble* and *John W. Oliver* for appellant Central Surety & Insurance Corporation.

*Clark, Boggs, Peterson & Becker, Howard B. Lang, Jr.,* and *William L. Nelson, Jr.,* for respondent.

WESTHUES, C.—On November 12, 1936, appellant, O'Malley, as Superintendent of Insurance, took charge of the affairs of Manufacturing Lumbermen's Underwriters, a reciprocal insurance exchange. This concern will be referred to as M. L. U. On October 20, 1937, O'Malley was succeeded in office by George A. S. Robertson. Robertson filed exceptions to the report of O'Malley with reference to the expenses incurred in handling the affairs of M. L. U. The trial court surcharged O'Malley with $85,264.44 and entered a judgment against O'Malley and his surety, the Central Surety and Insurance Corporation. From that judgment two separate appeals were taken. These appeals were consolidated in this court for the reason that they are in fact only one case.

We find in the brief of O'Malley a short summary of the various steps taken in the case. It reads as follows:

"O'Malley was Superintendent of the Missouri Insurance Department from July 1, 1933, until October 20, 1937. Central Surety and Insurance Corporation was the surety upon his bond as Superintendent. Manufacturing Lumbermen's Underwriters was a reciprocal insurance exchange, organized and doing business under the provisions of Article 11 of Chapter 37, Revised Statutes of Missouri, 1939 (Sections 6078 to 6089, Revised Statutes of Missouri, 1939, inclusive), and having its principal office at Kansas City, Missouri. Rankin-Benedict Underwriting Company, a corporation, was attorney-in-fact for this Exchange.

"Pursuant to the provisions of Sections 6052 to 6069, Revised Statutes of Missouri, 1939, inclusive, on November 12, 1936, O'Malley, as Superintendent, commenced a proceeding against the Exchange and its attorney in fact and was authorized by the Court, under Section 6057, Revised Statutes of Missouri, 1939, to temporarily take charge of the Exchange's property and receive its premiums and other income until final decree. O'Malley took charge as directed. The proceeding was resisted. After a trial, and on April 1, 1937, pursuant

842

to the provisions of Sections 6056 and 6058, Revised Statutes of Missouri, 1939, a final decree was entered, dissolving the Exchange and vesting title to its assets in fee simple in O'Malley as Superintendent for the use and benefit of the Exchange's creditors, subscribers and policyholders and others interested in it. Later, on August 14, 1937, finding that the Exchange could not be rehabilitated or reinsured, as authorized by Sections 6059 to 6065, Revised Statutes of Missouri, 1939, O'Malley, under Section 6061, Revised Statutes of Missouri, 1939, applied for, and the court granted an order to liquidate the Exchange. O'Malley continued in charge until October 20, 1937. On that date, he was succeeded by George A. S. Robertson as Superintendent.

"O'Malley's accounting covered the entire period he was in charge; that is, under the temporary order from November 12, 1936, to April 1, 1937, and under the final decree from April 1, 1937, until October 20, 1937."

For a full description of M. L. U. and similar organizations and their methods of doing business see In re Manufacturing Lumbermen's Underwriters, 18 Fed. Supp. 114; Wysong v. Automobile Underwriters, 204 Ind. 493, 184 N. E. 783, 94 A. L. R. 826, annotations beginning at page 836.

All of the parties agree that the questions involved in this lawsuit are governed and controlled by the insurance code as amended by the Legislature in the special session of 1933. [See Laws, Special Session 1933-1934, pages 66 to 71, now sections 6052 to 6069 inclusive, R. S. Mo. 1939.] The theory of the trial court in surcharging O'Malley, as evidenced by its judgment and respondent's brief, is that O'Malley incurred expenses in attempting to rehabilitate M. L. U. and in attempting to reinsure a portion of its business, when in fact he did not have that authority because he had not obtained an order from the circuit court authorizing him to do so. Note respondent's brief where it is stated:

"Respondent readily agrees that in 1933 the Insurance Code was amended so as to give the Superintendent power to operate a failing company placed in his hands and rehabilitate the same or reinsure the risks and that this power was not granted by the Code prior to the amendments in 1933. Respondent does not and has never contended that the amended Code of 1933 does not give this power to the Superintendent of Insurance. *Respondent, however, does assert that under the present Code the Superintendent has no authority to incur expenses in the operation of an insurance company temporarily placed in his hands under the provisions of section 1057, and has no power to incur any expense for the purpose of rehabilitation of said company unless and until a final hearing has been had in accordance with section 1056, and the Court has entered its decree authorizing the Superintendent to effect rehabilitation.* By the very terms of the

statute itself the powers vested in the Superintendent under the provisions of section 6061 are not conferred and do, not vest in the Superintendent until the Court, upon final hearing, has found that the Superintendent is entitled to take charge of the company and has ordered the Superintendent to attempt to rehabilitate the company.''

The above contention of respondent should be kept in mind when reading and considering the facts and circumstances under which O'Malley acted.

To properly understand the various steps taken by O'Malley as Superintendent of Insurance in connection with M. L. U. it will be necessary to give a history of the case. We will do this as briefly as circumstances permit. Many of the details will be omitted and the following cases involving various questions in connection with M. L. U. may be referred to for further facts: In re Manufacturing Lumbermen's Underwriters, 18 Fed. Supp. 114, opinion by OTIS, J., in the first bankruptcy proceeding; Robertson, Superintendent of Insurance, v. Manufacturing Lumbermen's Underwriters, 346 Mo. 1103, 145 S. W. (2d) 134, involving the question of attorneys' fees. M. L. U. was organized in the year 1898. Its subscribers were mainly persons and firms engaged in the lumber business. It was very successful and prospered as long as it confined its business to such firms and corporations. At the beginning of 1936 it was doing business in thirty-four states of the union and five provinces of Canada. It had accumulated a surplus of over $1,500,000.00. In the year 1933, through its attorney in fact, Rankin-Benedict Underwriting Company, it ventured into a new field, that of writing non-participating policies on general business on a straight premium basis. It was conceded by all parties that this new business venture was the cause of the difficulties which culminated in ruin for M. L. U. Differences of opinion arose as to the proper handling of the affairs between the attorney in fact and the committee representing the subscribers in M. L. U. During the year 1936, up to November 12, and before O'Malley took charge, the surplus was reduced from approximately $1,530,000.00 to $481,000.00. Policies were canceled by subscribers who demanded a return of the unearned premium and their share of the surplus. Four states had suspended the license of the Exchange to do business. When O'Malley took charge of M. L. U. an examination of its affairs was being made by the Superintendents of Insurance of Missouri, Iowa, Illinois and Oklahoma. O'Malley's petition was assigned to Judge Daniel E. Bird. The court made an order, as contemplated by section 6057, authorizing O'Malley to take temporary charge of the property of M. L. U. and to receive its premiums and income. M. L. U. and its attorney in fact were restrained from further transaction of business. Harold C. Fielder was appointed by the superintendent as agent to take charge of ▮▮▮ the affairs of the company and placed

under a fifty thousand dollar bond. On November 16, the attorney in fact filed an application for a change of venue, or rather an application to disqualify the trial judge. The court never ruled on this application. November 18, by agreement of the parties, the case was continued for a final hearing until a report could be had of the examination by the departments of insurance of the four states above mentioned. That examination was completed December 21, 1936. However, prior thereto, on December 1, 1936, the attorney in fact filed a petition placing M. L. U. in voluntary bankruptcy, which petition was dismissed by Judge Otis on December 30, 1936. [See In re Manufacturing Lumbermen's Underwriters, supra.] On January 16, 1937, the attorney in fact filed a mandamus proceeding in the Supreme Court to compel Judge Bird to act upon the application to disqualify himself. This court issued a stop order, which continued in force until February 19, 1937, preventing Judge Bird from making any further orders. On February 27, 1937, and while the application to disqualify Judge Bird was still pending, an involuntary petition in bankruptcy was filed by a number of creditors of the Exchange. This proceeding was dismissed by Judge Reeves on July 7, 1937, and shortly thereafter an appeal was taken to the United States Circuit Court of Appeals. On March 2, O'Malley filed an amended petition setting forth the facts as disclosed by the examination of the insurance departments of the four states above mentioned. In order to eliminate the question of the qualification of Judge Bird, O'Malley, on March 3, filed an application for a change of venue, which Judge Bird granted, and the case was transferred to Judge Allen C. Southern. Thereafter, on April 1, 1937, the court entered a decree, as provided for in sections 6056 and 6058, permanently enjoining the defendants, dissolving the Exchange and vesting title to the property in the Superintendent of Insurance. On August 14, 1937, after the second bankruptcy petition was dismissed, O'Malley filed a petition in the court that he be directed to liquidate the Exchange. The court so decreed. Since all of the items surcharged against O'Malley were expended prior to the liquidation order we will have little to say as to what occurred thereafter.

It will be noted that on November 12, when O'Malley was placed in charge of M. L. U., an examination was in progress to determine the exact financial standing of the Exchange. The superintendent therefore could not petition the court for a final decree or for an order to rehabilitate, reinsure or liquidate. It would have been futile to have asked for any definite order before that examination was completed, which was December 21, 1936. In the meantime bankruptcy proceedings had been filed and a receiver appointed to take charge of the property. On December 12, 1936, under the foregoing circumstances and while the dispute was being litigated as to whether the Federal Court or the State Superintendent of Insurance should have charge

of the property, both Federal and State courts approved a stipulation entered into by the parties in litigation which had the effect of a court order and which read as follows:

" 'Pursuant to stipulation of this date, and without prejudice as recited in said stipulation, R. E. O'Malley, Superintendent of Insurance of the State of Missouri, and Commerce Trust Company, Trustee, are authorized to pay to such clerical and actuarial employees and assistants and examiners as shall be designated by said R. E. O'Malley, Superintendent, such portions of compensation as said R. E. O'Malley or his duly authorized deputies or agents shall direct for such period up to, but not beyond, December 12, 1936, as he or his said agent or deputy shall direct, it being understood that said R. E. O'Malley, Superintendent, may, at his own discretion, determine the employees and assistants to be paid and the amounts to be paid to them, and may discharge such of them as he deems unnecessary to employ. Provided, however, in no event shall said R. E. O'Malley, Superintendent, pay to any such employee or assistant or examiner compensation at a higher rate than such employee or assistant had been receiving up to the time said R. E. O'Malley, Superintendent, took charge, or, as to examiners, higher than customary. Provided, further, that no compensation shall be paid to any director of Rankin-Benedict Underwriting Company.' "

On December 23, 1936, the following order was made:

" 'Pursuant to a stipulation dated December 12, 1936, and a supplemental agreement and without prejudice as recited in said stipulation, R. E. O'Malley, Superintendent of the Insurance Department of the State of Missouri, and Commerce Trust Company, Trustee, are authorized to pay such ordinary expenses, including traveling expenses, postage, telegraph, telephone and usual operating expenses as shall be designated and determined by said R. E. O'Malley, Superintendent; and it is further ordered that the order of this Court of December 12, 1936, be modified so as to authorize payment of compensation to H. L. Fulton and Charles H. Isbell, even though they are directors of Rankin-Benedict Underwriting Company.' "

On January 8, 1937, the following order was entered:

" 'It is Ordered that R. E. O'Malley, Superintendent of the Insurance Department of the State of Missouri, in charge of the affairs of defendant exchange, be and he is hereby authorized to pay such ordinary expenses, including traveling expenses, postage, telegraph, telephone, investigation, examination and usual operating expenses, as shall be designated and determined by said R. E. O'Malley, Superintendent.' "

No further orders with reference to the payment of the clerical force appear until after the order of liquidation made on August 14, 1937.

 It will be noted from the foregoing that from November 16, 1936, until July, 1937, some action was pending, either in the Federal

court or in the State court, which prevented O'Malley from obtaining any definite order in the State court. A rehabilitation, reinsurance or liquidation order by the State court while bankruptcy proceedings were pending in the Federal court would have been futile. So too the application to disqualify Judge Bird tainted the State court's jurisdiction. That question was not settled until O'Malley filed a similar application which the court sustained. In the meantime what was O'Malley to do? The courts, both Federal and State, pursuant to stipulation, entered orders authorizing the superintendent to maintain the business of M. L. U. in status quo until the disputed questions as to jurisdiction could be settled. At least the orders may be so interpreted because they authorized O'Malley to pay the clerical force necessary to maintain the status quo.

Respondent in his brief states:

"Jurisdiction to operate and attempt to rehabilitate the exchange could be acquired only by compliance with the statutes providing therefor. The statute not having been complied with, no jurisdiction to operate or rehabilitate the exchange was acquired even though compliance with the statute may have been prevented by events and circumstances beyond the control of the Superintendent."

This requires an examination of the insurance code to determine just what are the duties and powers of the State Superintendent of Insurance when an insurance concern is placed in his charge. This question must also be considered in the light of the peculiar circumstances of the present case. At the outset of this discussion we may state that the record in the case disclosed beyond doubt, and respondent concedes, that the conditions of M. L. U. were such that the Superintendent of Insurance was justified in applying to a court for an order to temporarily take charge of the concern. The record also disclosed beyond doubt that the affairs of M. L. U. were such that it should have been rehabilitated; that to effect a rehabilitation it was advisable, if not imperative, to rid M. L. U. of the general business it had taken on since 1933 by reinsuring that phase of the business. We may also make the assertion, without discussion, that the law favors rehabilitation where this can be accomplished. All sections of the statute will have reference to the 1939 revision. Section 5781 requires the Superintendent of Insurance to be experienced in matters of insurance. Section 6052 provides:

"Whenever it shall appear to the superintendent of the insurance department, from any examination made by himself, or from the report of a person or persons appointed by him, or from the statements of the company, or from any knowledge or information in his possession, . . ."

Then the section sets forth conditions under which the Insurance Superintendent may act and concludes as follows:

". . . said superintendent may institute a suit or proceedings

in the circuit court . . . to enjoin said company from further prosecution of its business, either temporarily or perpetually, or for a judgment dissolving such corporation or for both; and after the entry of such decree or judgment, the court upon the motion of the superintendent of the insurance department may order the liquidation, settlement and winding up of the affairs of such company or the rehabilitation of such company as provided in this chapter, together with such other decrees and orders in connection therewith as the court shall deem advisable."

It will be noted that the law provides that, "after the entry of such a decree or judgment, the court upon *the motion of the superintendent of the insurance department may order the liquidation, . . . rehabilitation of such company . . .*" (Italics ours.)

In case the superintendent files such a motion he should be in a position to present to the court the facts justifying the order sought in such motion. In this case the examination of the company's financial condition was being investigated at the time O'Malley took charge and the court properly, upon the application of the superintendent, continued the case until that examination was completed. Section 6057 provides as follows:

"If the superintendent of the insurance department shall apply, either at the time of or after the filing of the petition referred to in section 6052, R. S. of Mo. 1939, the court may, if the court deem it necessary, authorize him to temporarily take charge of the property of the defendant and to receive its premiums and other income until a final decree is rendered."

The court in this case entered an order pursuant to the above section placing O'Malley in charge of the affairs of M. L. U. Respondent contends that the superintendent, under an order of court made as above, cannot do anything except receive the premiums and other income of the company. Respondent in making that contention overlooked the fact that the superintendent was not only authorized to collect the money coming in but he was placed in charge of the property of that concern. The statute contemplates the time between the temporary order and a final judgment entered pursuant to a hearing, to be of very short duration. It is our opinion that it is the duty of the superintendent, when he takes charge under an order pursuant to section 6057, to preserve the status quo until a final decree may be had. Evidently both the trial court, before whom this case was pending at that time, and the Federal court were of that opinion when O'Malley, on December 12, was authorized to pay the employees engaged in taking care of the affairs of M. L. U. Had it not been for the application to disqualify the trial judge and for the bankruptcy proceeding O'Malley would have been in a position, on December 21, to have asked the court for a final decree, and also would have been free to have asked for rehabilitation and reinsurance

orders. In the circumstances no definite order could be obtained. The superintendent therefore attempted to maintain the status quo while awaiting the determination of the questions of jurisdiction pending in the courts. The Supreme Court of California in Carpenter v. Pac. Mut. Life Ins. Co. of Cal., 74 Pac. (2d) 761, l. c. 775, had the following to say that may be appropriate:

"Under the statutory plan thus embodied in the Insurance Code, the state, acting under and within its police power, has provided that the commissioner, when an insurance company is in financial difficulties, shall first be appointed by the court as conservator. As such, it is his duty to operate the company and to try to remove the causes leading to its difficulties. If this cannot be done, then he must attempt to rehabilitate the business of the company as conservator or liquidator, by entering into, with court approval, either reinsuring or rehabiliation agreements. Only if this cannot be done and further efforts 'would be futile' should liquidation be resorted to."

In the same case at page 772 the court said:

"The moment Carpenter took possession of the company its right to do business in this and other states ceased. Obviously if this cessation of business continued for any appreciable period the intangible assets already mentioned would have been irreparably lost to the injury of all concerned.

The evidence disclosed that the superintendent did, through the employees under his charge, have examinations and reports made showing the exact status of the general business of M. L. U. for the purpose of reinsuring that phase of the business. He negotiated with the Pearl Insurance Company for that purpose and later with the Atlas Insurance Company. Evidence also disclosed that the employees compiled the necessary information and in a general way prepared to rehabilitate M. L. U. by ridding it of its termite condition, which was the general business, leaving to M. L. U. the reciprocal business. The plan of reinsurance in the Pearl Insurance Company of the general business in all probability would have been consummated had it not been for the application to disqualify the trial court and for the bankruptcy proceedings which caused the cancellation of thousands of policies. Another unforeseen event which threw consternation into the plan was an unusual flood in the Ohio valley which ▮▮▮ resulted in losses in excess of $200,000.00, covered by policies of M. L. U. The Pearl Insurance Company then withdrew from further considering taking over the general business. Thereafter the second bankruptcy proceeding further aggravated the situation and by the time that question was settled M. L. U. was ready for liquidation.

▮ Now to the question of whether O'Malley, under the above circumstances, as Superintendent of Insurance, was by virtue of the insurance code and the orders of court authorized to expend funds

of M. L. U. for the purpose of rehabilitating, reinsuring and maintaining as far as possible the status quo while actions were pending in the courts which prevented any definite order being made. This question must be answered in the affirmative. In the first place let it be understood that the insurance department under the law is an administrative agency having many powers and duties under and by virtue of the insurance code. The superintendent is not a mere receiver under court orders. This court expressly so ruled. [State ex rel. v. Hall, 330 Mo. 1107, 52 S. W. (2d) 174, l. c. 177 (1, 3); O'Malley v. Continental Life Ins. Co. et al., 343 Mo. 382, 121 S. W. (2d) 834, l. c. 836 (1).] In the latter case the court said:

"Whatever may be the rule in the case of an ordinary receiver for a court of equity, we hold that no such special order is necessary to authorize an appeal by the Superintendent of Insurance because he is not merely an equity receiver but a trustee authorized to act by the provisions of our insurance code, subject, of course, to judicial review in many instances. [State ex rel. Missouri State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S. W. (2d) 174; State ex rel. St. Louis Mutual Life Ins. Co. v. Mulloy, 330 Mo. 951, 52 S. W. (2d) 469; Relfe v. Rundle, 103 U. S. 222, 26 L. Ed. 337.]''

The United States Supreme Court many years ago in the case of Relfe v. Rundle, 103 U. S. 222, l. c. 225, had the following to say concerning the Missouri Superintendent of Insurance:

"Relfe is not an officer of the Missouri State court, but the person designated by law to take the property of any dissolved life insurance corporation of that State, and hold and dispose of it in trust for the use and benefit of creditors, and other parties interested. The law which clothed him with this trust was, in legal effect, part of the charter of the corporation. He was the statutory successor of the corporation for the purpose of winding up its affairs. As such he represents the corporation at all times and places in all matters connected with his trust. He is the trustee of an express trust, with all the rights which properly belong to such a position. He is an officer of the State, and as such represents the State in its sovereignty while performing its public duties connected with the winding up of the affairs of one of its insolvent and dissolved corporations. His authority does not come from the decree of the court, but from the statute."

Of course the superintendent cannot without an order of court rehabilitate, reinsure or liquidate an insurance concern taken over under the statute. The court is the forum where the parties interested may assert their rights and object to any proposal made by the superintendent. So too with reference to the expenses of administration. The court wherein the case is pending is open to anyone who desires to question the reasonableness thereof. But the superintendent need not, while he has an insurance concern under his control, ask the

court in advance for authority to engage the help necessary to do the work incident to the handling of the affairs of such a company. The statute, section 6065, says that the superintendent shall at least every twelve months make a report to the court of all receipts and disbursements. That same section authorizes the court to require the superintendent to report more often if the court deems it necessary. Those provisions certainly contemplate that the superintendent is clothed with much discretion in conducting and managing the affairs of insurance companies placed under his control. In this case the trial court by its judgment held that O'Malley could not take any steps or expend any money for a clerical force to reinsure or rehabilitate without first having an order of court authorizing him to do so. Note the court's conclusion on this point:

"That R. E. O'Malley was not authorized to proceed to reinsure the risks of Manufacturing Lumbermen's Underwriters.

"That R. E. O'Malley was not authorized to attempt to effect a rehabilitation of Manufacturing Lumbermen's Underwriters and no order of rehabilitation was by the court made."

Section 6064 provides that whenever any decree enjoins a company perpetually from further prosecution of its business, etc., the superintendent may cause a report to be made showing the condition of the company. The section further provides that:

"Whenever such report shall show facts warranting, *in the opinion of the superintendent of the insurance department*, the reinsurance of the risks of such company, then, subject to the approval and direction of the court, said superintendent shall proceed to reinsure." (Italics ours.)

The section does not make any reference to a court order until the superintendent has accumulated the facts as to the condition of the company. It is therefore our conclusion that the superintendent may have that work done without authority of court.

 With reference to rehabilitation it will be noted that statute section 6052 reads, that after the court has entered a judgment as therein contemplated "the court upon the motion of the superintendent of the insurance department may order . . . the rehabilitation of such company . . ." When the superintendent files such a motion in court he should be prepared to submit facts to the court which would justify the request made. That can only be done by having a report of the actual conditions of such company. To ascertain such a condition the superintendent must of necessity employ accountants and other necessary clerical help. Respondent's position is, that the superintendent cannot employ any help for such purpose without the approval of court and that the court must in the first instance fix the compensation of such employees. Section 6065 governs this question. Note its reading:

"He shall have power and authority, however, in such cases, and through the course of the whole case, to employ the necessary legal counsel and assistance, and clerical and actuarial force, subject to the approval of the court as to the amount of compensation to be paid them, . . ."

By an order the trial court in this case placed a limitation on the amount to be paid the employees in that they were not to be paid more than they had been paid by the attorney in fact for M. L. U. The pay roll was expressly approved and ordered paid by the court up to December 12, and note that O'Malley did not pay any help until ordered to do so by the court. The statute authorized the superintendent to employ the necessary help, and as to their compensation he must have and in this case did have the court's approval. The fact that the law contemplates that all expenses be subject to approval of the court does not mean that the court in the first instance must designate the number of employees. Respondent cites section 5788 as authority for the position that the superintendent cannot employ any help unless designated by the court. The latter portion of that section, found in article 1, chapter 37, lends some support to the argument. The sections governing these proceedings are found in article 10, chapter 37. Section 5788 contains general provisions concerning the Superintendent of Insurance, while the sections we are dealing with in article 10 cover specifically the proceedings to be followed in case the superintendent takes over an insurance concern. We rule that insofar as there may be a conflict the special provisions should govern.

Respondent argues that the superintendent had no power or authority to conduct the business of M. L. U. until after the court had directed rehabilitation, citing section 6061. This case never reached that stage. O'Malley did not conduct the business of M. L. U. except in a very limited degree. No new business was taken on. All unwritten policies in the hands of the agents were ordered returnd to the office. O'Malley did attempt to preserve the status quo of M. L. U. and have its affairs in such a condition that he could ask the court for an order to rehabilitate and reinsure as soon as a court vested with jurisdiction could make the necessary orders. That such a day was long delayed was no fault of the superintendent. When that day did arrive it was too late to do anything but ask for an order liquidating the concern. In the circumstances we are of the opinion that the superintendent did nothing more than the insurance code and the orders of the court authorized him to do. The holding and conclusions of the trial court that O'Malley expended money to conduct the business of M. L. U., to rehabilitate and reinsure without authority, is therefore erroneous. We have read many cases upon this subject cited in the briefs before reaching the above conclusion. We may say here that this case was exceptionally well briefed. The

statute authorizing rehabilitation is new and therefore not many cases are to be found directly in point. The following are the principal cases considered: State ex rel. Hyde v. Falkenhainer, 309 Mo. 381, 274 S. W. 722, which was disapproved in O'Malley v. Continental Life Ins. Co., 343 Mo. 382, 121 S. W. (2d) 834; Relfe v. Rundle, 103 U. S. 222; State ex rel. Mo. State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S. W. (2d) 174; Robertson, Superintendent of Insurance, v. Manufacturing Lumbermen's Underwriters, 346 Mo. 1103, 145 S. W. (2d) 134; State ex rel. Lucas v. Blair, 346 Mo. 1017, 144 S. W. (2d) 106; Carpenter v. Pac. Mut. Ins. Co. of Cal., 74 Pac. (2d) (Cal.) 761. Before leaving this subject we wish to make the observation, or rather ask what would have happened to the affairs of M. L. U. if O'Malley, under the temporary order of the court entered on November 12, had only collected the premiums and other moneys coming in, as respondent contends he should have done? What would have been the rights of the parties with reference to the thousands of policy cancellations that came to the office the first sixty days or so? What about the losses which occurred, including the $200,000.00 in the Ohio flood? Suppose further that the controversy as to the jurisdiction of the courts had terminated in January and O'Malley had done nothing except collect the money coming in. Needless to say that the affairs would have been in a chaotic condition, rehabilitation rendered impossible and the purpose of the law defeated through the dereliction of the Superintendent of Insurance. We rule therefore that the surcharge against O'Malley cannot be sustained on the theory that he acted without authority of law.

 A number of other points remain in the case which involve purely questions of fact. The court in its judgment made the following finding:

"That during the time he was in charge of Manufacturing Lumbermen's Underwriters as superintendent of insurance, R. E. O'Malley expended large sums of money from the assets of Manufacturing Lumbermen's Underwriters for the benefit of persons, companies and associations other than Manufacturing Lumbermen's Underwriters, all without any legal authority whatsoever."

Following the above general statement the court made specific findings with reference to salaries, ruling that they were not rendered for the benefit of M. L. U. and ruling similarly with reference to rent paid for quarters not used by M. L. U. and with reference to telephone and telegraph bills paid by O'Malley for the benefit of others. The record shows that the Atlas Insurance Company and another concern occupied small spaces in the quarters rented by the attorney in fact for M. L. U. The telephones were also used by these concerns. A complete audit was made of the affairs of M. L. U. under the direction of the court and under the supervision of the respondent superintendent. This audit, dated February 23, 1938,

disclosed that Atlas paid to the superintendent, for the benefit of M. L. U., the sum of $1,050.00 for rent and $226.30 for the use of telephones. There is not one scintilla of evidence in the record that those amounts were not adequate. Other small matters were proven which we would be justified in ignoring but we call attention to one or two. The attorney in fact for M. L. U. had rented accounting machines that were used by the superintendent after he took charge. It was proven that the Atlas also used these machines. We quote two questions and answers of witness Fielder, which will demonstrate the insignificance of this item.

"Q. I will ask you if these tabulating cards on direct as well as reinsured business, accounts current of the Atlas Insurance Company, were not run through the Powers accounting machine rented by M. L. U. and run by M. L. U. employees? A. I don't know. The date you mention there were some cards run through after that time. I don't know what date they were run through.

"Q. Was there any compensation paid to M. L. U. by the Atlas? A. I don't know why there should be. The work was done at night on the operators' own time."

For some time after O'Malley took charge of M. L. U. four employees of Atlas, who were not being paid out of M. L. U. funds, had desk space in the office for which no payment was exacted. Mr. Fielder, the agent in charge for O'Malley, testified that these employees did work beneficial to M. L. U. Note his evidence:

"They assisted in effecting the cancellations as to those policies in which they were also interested? A. That is right.

"Q. And assisted in keeping the records incident to them? A. Yes, sir.

"Q. And in carrying on the correspondence incident to them? A. That is right."

"Q. (Mr. O'Brien) I say in your judgment was the services which these people [760] were rendering of value to Manufacturing Lumbermen's Underwriters? A. Yes, sir.

"Q. Did you pay them anything? A. I paid them nothing, no."

Respondent filed an additional abstract of the record which disclosed that the Superintendent of Insurance succeeding O'Malley in charge of M. L. U. made a settlement of all claims against Atlas and other concerns which were alleged to have been favored by O'Malley in the rent and telephone matter. Accounts were pending with these concerns while O'Malley was in charge. In the settlement made the superintendent reserved the right to prosecute the claim made against O'Malley. We see no reason why the settlement should have contained any such reservation. O'Malley was not liable unless he knowingly paid out funds for the benefit of these concerns and the evidence does not justify any such finding. The amounts were small. For

example, the rent of Atlas was for December and January. Rent was paid by Atlas after January, and before that time, Fielder, who was in charge for O'Malley, considered the work performed for M. L. U. by employees of Atlas sufficient to pay the rent. The finding of the trial court that O'Malley expended funds of M. L. U. for the benefit of others is therefore not supported by the evidence.

With reference to the reasonableness of the amount expended for salaries the evidence leaves room for only one conclusion, that is, that the employees were not overpaid and that they worked faithfully, often beyond the regular closing time, without extra pay. We can visualize the turmoil resulting from various phases of this litigation involving such a large insurance concern. The rights of policyholders cancelling policies in such a situation had to be taken care of and losses occurring had to be investigated. Agents from all parts of the country and Canada wired for instructions as to what to do. Many came in person. The insurance departments of the various states and Canada were demanding information, and in a number of states proceedings were instituted to liquidate. One witness described the situation as being a mad-house for weeks after O'Malley took charge. Certainly it required as much work to take care of that situation as it did to take care of the concern when it was not in difficulty. The trial court made a finding with reference to the salaries paid from November 12, 1936, to August 15, 1937, when the liquidation order was made. The order reads as follows:

"The court further finds that O'Malley has failed to prove what, if any, of the sums expended for salaries from November 12, 1936, to August 15, 1937, were reasonable in amount and were expended for the benefit of and in the handling and settling of the business of Manufacturing Lumbermen's Underwriters. The court therefore finds that during said period from November 12, 1936, to August 15, 1937, the sums expended for salaries and for which credit is claimed were not reasonable, were not necessary and were not beneficial in the handling and settling of the business of Manufacturing Lumbermen's Underwriters, and credit therefor is refused upon this accounting."

The trial judge before whom the case was pending, by an order on December 12, 1936, expressly authorized O'Malley to pay the employees their salaries up to that date. Certainly O'Malley should not now be surcharged with the money paid pursuant to that order. Yet the trial court in this case surcharged O'Malley with every cent that was thus paid out. Taking into consideration the circumstances under which O'Malley was laboring let us see if the amount paid for salaries seems unreasonable. Up to November 12, 1936, the monthly pay roll had been approximately $26,000.00. During the first month under O'Malley it was approximately $16,000.00. In January it was $10,000.00 and in February $8,900.00. There was a gradual reduction from then to July, 1937, when it was $2,860.00. The same is true as to

the item of rent. The court found that the sum of $350.00 per month, from November 12, 1936, to October 19, 1937, should be allowed. The sum actually paid out was $10,868.25. The attorney in fact for M. L. U. occupied two floors in the Fidelity building under a lease at a rental of $1,845.00 per month. The office equipment was owned by the attorney in fact and had been pledged as security for the rent. This equipment was used by the superintendent and no extra rent was paid therefor. It will be noted that if O'Malley had continued to pay rental as specified the amount would have been approximately $20,000.00. The rent was reduced from time to time and one of the floors was released when it was no longer needed. No evidence was introduced that suitable and adequate office space and equipment could have been obtained at a less rental.

▇▇▇ The entire surcharge in this case can have no basis except upon the theory that the Superintendent of Insurance had no authority under the law to rehabilitate M. L. U., maintain its status quo or reinsure the so-called general business without first going to the trial court and obtaining specific authority so to do. It is respondent's theory that no matter how honestly O'Malley may have acted in dealing with the affairs of M. L. U., he had no legal authority to act as he did and therefore he must be surcharged with the expenses thus incurred. This, as we see it, is an erroneous theory. As we pointed out the Superintendent of Insurance has certain powers and duties under the insurance code as a state officer and is not merely a receiver appointed by the circuit court. We say without hesitation that had it not been for the unwise attempt of certain parties to place M. L. U. in bankruptcy and otherwise hinder the actions of O'Malley by applying for a change of venue, rehabilitation of M. L. U. would have been an accomplished fact within a very short time after the superintendent took charge. That this was not accomplished was not O'Malley's fault and he and his surety should not be made the victim.

The judgment is reversed. *Bohling* and *Barrett, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.