CARRIE E. LIMPUS, RESPONDENT, v. NEW YORK LIFE INSURANCE COMPANY, APPELLANT.—226 S. W. 2d 97.

Kansas City Court of Appeals.   Opinion delivered December 5, 1949.

28

*Lathrop, Crane, Sawyer, Woodson & Righter, Richard S. Righter* and *Horace F. Blackwell, Jr.,* for appellant. *Ferdinand H. Pease* of counsel.

*Cross & Cross, Maurice P. Murphy, R. H. Musser* and *Harry A. Hall* for respondent.

SPERRY, C.—Carrie E. Limpus, widow of Oran Limpus, deceased, sued on a life policy issued by New York Life Insurance Company, defendant to the said Oran Limpus. Trial to a jury resulted in judgment for plaintiff in the sum of $4270, which includes the full face of the policy and interest thereon. Defendant appeals.

Defendant challenges the jurisdiction of the trial court. The following facts are pertinent to that issue.

Insured died November 24, 1929, and the petition was filed February 17, 1930. Defendant filed demurrer, a motion to stay proceedings, and for security for costs. The cause was continued, by agreement of the parties and order of the court, through 1931, 1932, 1933. At the September Term, 1935, the following appears on the *judge's* docket: "Pass to unprinted docket." September, 1936, the following appears on the *judge's* docket: "Pass off docket."

It was stipulated in open court that the case was thereafter continued from time to time, by agreement, until trial date; and defendant offered to prove by the testimony of one of its attorneys, that it had repeatedly asked that the cause be tried.

April 28, 1939, defendant filed a deposition, taken in the state of Iowa, on the merits of the case.

September 27, 1944, plaintiff moved to reinstate the case on the docket, alleging that said cause was pending, that plaintiff desired that it be heard and determined, and that counsel for defendant, naming them, had been served with notice of the filing of said motion. In connection therewith the following appears on the judge's docket: "Ordered reinstated on trial docket."

February 19, 1945, defendant filed the depositions of three witnesses, taken in the state of New York, on the merits.

April 1, 1946, by agreement of the parties, the cause was set for trial on April 22, 1946. April 12, 1946, plaintiff filed a deposition taken on her behalf, on the merits.

June 10, 1946, defendant filed depositions of three witnesses, taken in St. Joseph, on the merits.

January 7, 1947, the case was set "specially" for trial on March 25.

April 8, 1947, defendant's motion to dismiss, and its demurrer, were overruled, and defendant filed answer.

Trial was begun on October 5, 1948.

The trial court has inherent power to dismiss a cause for failure to prosecute with diligence. Guhman v. Grothe, 346 Mo. 427, 142 S.W. 2d 1; but the order made in this case, if it was an order of dismissal, is silent as to the grounds therefor. True, the record fails to show any action taken, as to continuances or otherwise, during 1934, 1935 and a part of 1936. However, it was automatically continued. Alexander v. Haffner, 20 S.W. 2d, 896, l.c. 898. If the order was one of dismissal the trial court was without power to reinstate

the cause in 1944, or to make any order touching it. State ex rel. v. Trimble, 311 Mo. 128, l.c. 144, 277 S.W. 916.

But the vital question is whether the court dismissed the cause. At the time the order was made defendant's demurrer, and certain motions, were pending and undisposed of. Although the petition stated a cause of action, to the merits of which defendant had not yet pleaded, various pending motions prevented actual trial on the merits, or the rendering of a default judgment against defendant. The judge, at that time, maintained more than one "docket."

If the court had used the term "dismissed" its meaning would have been clear. Webster's New International Dictionary, 2d Ed. 1943; Black's Law Dictionary, 3rd Ed. (1933) page 590. The cause would not have been, thereafter, pending. We do not hold that a cause may not be dismissed except by use of the word "dismissed" but, if other words are used, their meaning and intended effect may be open to judicial interpretation. However, if the words used indicate a clear intention to dismiss the action, such effect will be given to them.

The following facts may be considered in determining the meaning of the order. The practice of the court in maintaining at least two dockets; the action of the court in continuing the case, by agreement of the parties, from and after 1936; the taking of depositions on the merits by defendant, in 1939; the reinstatement of the case to the "trial docket," on motion of plaintiff, unopposed by defendant, in 1944; the taking of various depositions by both parties, on the merits, after reinstatement of the case; the claimed persistence by defendant for a trial; the action of the court in specifically setting the case for trial on a number of occasions, by agreement of the parties; the failure of defendant to raise this question prior to the filing of its answer some eleven years after the entry of the order which, it now contends, removed the cause from the court's jurisdiction.

We are unable to say that the words used clearly indicate a dismissal, or that the court intended the order to have that effect. If the judge who made the order, and the parties, had not treated the cause as pending, following its entry, we might be inclined to rule that the cause was dismissed; but they were familiar with practice obtaining in that court, they did not interpret it as an order of dismissal, nor did the court; and we are inclined to adopt their construction. We hold that the cause was not dismissed.

The policy was issued in 1918, and insured was accidentally killed November 24, 1929. The policy was in the principal sum of $1000, and provided for double indemnity in case of accidental death. It also provided for waiver of premiums and payment of disability benefits if insured should become totally and permanently disabled, while the policy was in effect and no premium was past due, after

due proof thereof. No notice of disability was given until after the policy had been lapsed and placed on an extended paidup basis. The extended term had expired before insured's death occurred.

If plaintiff can recover at all it must be on the theory upon which the cause was tried and submitted: That insured became, and remained, totally and permanently disabled by reason of insanity, prior to February 13, 1927; and that his failure to give notice thereof was excused by reason of the nature of his disability.

Defendant presents three propositions for our review, towit: (a) that there was no substantial evidence of insured's insanity; (b) that insanity of insured constitutes no valid excuse for failure to furnish notice and proof of disability prior to the date the policy was lapsed for failure to pay premiums; and, (c) that plaintiff is not entitled to recover interest for a period of 19 years, because of her failure to prosecute diligently.

Insured was employed as a traveling salesman, from about 1904, until 1921. During the summer of 1921 he suffered a stroke and was confined to his bed for several months and, during the remainder of his life, he dragged his left foot and leg, and suffered from an impairment of the use of his left arm, the left side of his face and mouth was twisted and drawn, and he was unable to talk clearly.

On the issue of insanity, plaintiff and her two daughters, testified to the following effect: that insured, prior to suffering a stroke in 1921, was uniformly cheerful and kindly to his family, worked steadily and earned a good living for them, brought money to the home, never cursed or used vile language, never threatened or abused either his wife or daughters, had many friends of whom he was fond, and treated guests who visited in the home with courtesy and friendliness; that after he was able to be out of bed, following the stroke, he was greatly disabled physically; that he could not drive his car; mumbled when he talked; that he eventually went back to work for his old employer, for a few months, but worked in the office instead of as a salesman; that he was unable to do that work and quit; that he then tried to sell goods which he bought on his own, but was unable to do so; that he, thereafter, searched for employment but never worked; that he would get lost in St. Joseph, where they lived, would take the wrong street car, would get off at the wrong corner; that his condition grew progressively worse; that he became abusive and threatening toward members of the family; that he frequently threatened to burn the house and kill them; that he would hide various objects in the house, including a butcher knife which, he said, he intended to use; that he would fly into violent rages, and use vile and profane language; that he would order guests out of the house, and would be rude to the friends of his daughters; that he would say that his family and friends had all turned against him; that he would sit and mumble, would poke

cigar ashes into a tray and pack them down, saying that he was going to pave the driveway with them; that, while the family owned no property except the equity in a home, he would say that he had plenty of money and the family need not worry; that on one occasion he rushed at plaintiff, cursing and threatening to kill her, without any known reason; and that he hid first class mail which was found, unopened, after his death. Plaintiff stated that she knew nothing about this policy until after it had been lapsed.

A minister who visited in the home over a period of from two to three years prior to insured's death, stated that the first time he saw insured he believed him to be of unsound mind; that his eyes "blurred and stared"; that he would stare off into space; that he would talk like a normal person at times and then he would change to something else and lose himself; that he never fully completed a conversation; would take off his shoes in the presence of visitors and leave the room, with no remark or statement; that he would sit and poke ashes into a vessel and pack them down with a pencil; that he complained that his family and friends had turned against him; he mumbled to himself; that he was moody and despondent; that upon his last visit, shortly before insured's death, witness urged plaintiff to have him committed to an institution because he considered him to be dangerous.

A former assistant manager of the company for which insured worked, testified to the effect that insured worked but a few months in the office, after he sustained the stroke, was unable to do the work, quit and, for a short while, ran a small store of his own but did not make a success of it; that he did not know of his working after that time.

A medical doctor testified to the effect that a stroke causing such extensive physical damage as was shown to have been suffered by insured would probably cause mental damage as well.

Defendant introduced some original pages from the books of insured's former employer. These tended to show that insured had an active automobile account with the company until shortly before his death, and that the company carried a group life insurance policy for him until sometime in 1928. There was evidence to the effect that the company carried no such accounts except for their employees, and that the accounts would have been closed had his services been previously terminated. Records of salary or commission payments to former employees were shown to have been destroyed prior to the trial. Former fellow employees of insured testified on behalf of defendant as to the extent and duration of insured's employment subsequent to 1921, but such evidence was not of a very clear or satisfactory nature. Some said they didn't know whether he worked for a short while or for years. They stated that they considered him sane so long as he worked for the company.

The facts and circumstances in evidence, as stated by witnesses for plaintiff, constitute substantial evidence of insanity. Schoen v. American National Insurance Company, 167 S.W. 2d 423, l.c. 427; Hoffstatter v. Johnson, 208 S.W. 2d, 924, l.c. 925. The jury was justified, from the evidence, in finding that insured was insane prior to February 13, 1927, and remained in that condition until he died.

Plaintiff contends that the furnishing of proof of disability is excused because of insured's insanity. They cite Schoen v. American National Insurance Company, supra, and same case, 180 S.W. 2d, 57, the latter by the Supreme Court.

In that case the policy required due proof of disability to be furnished by "insured" and it was held that *insured* was excused from doing so because it was impossible for an insane person to have complied with such a provision, and that recovery should be permitted because the very thing that caused his disability rendered it impossible for him to furnish proof thereof. To the same general effect see Hayes v. Continental Gas Company, 72 S.W. 2d, 135, l.c. 137, an accident case.

However, in this policy, it is required only that proof be furnished, not that it be furnished by *insured*. Defendant contends that the rule announced in the foregoing cases does not apply because of the differing policy provisions. Defendant contends that the language used in the Schoen case indicates that the rule was announced solely because the condition was one impossible of compliance by insured, whereas anyone, under the terms of this policy, could have furnished the proof. Their contention is unsound. In Smith v. Woodmen of the World, 179 Mo. 119, l.c. 136, it was held that a provision requiring proof to be furnished by insured would be construed as permitting the proof to be furnished by anyone, and could be signed by the person furnishing the proof. In view of that decision, we cannot give the language used in the Schoen case the narrow construction contended for by defendant. In Appleman's Insurance Law and Practice, Vol. 15, par. 8317, it is said that the better rule is that failure to furnish proof of disability of an insane insured is no defense, nor is the failure of the beneficiary to furnish such proof a ground for defense. The wisdom of this liberal rule is demonstrated in the case before us, where plaintiff's evidence was to the effect that she knew nothing about the terms of this policy, and insured resented any inquiry regarding his affairs. An insane insured might not be mentally capable of securing another to furnish proof of his condition. Many insane persons do not even know that they are insane. Insured paid defendant for the "waiver" of premiums and the latter should not, in equity and good conscience, be permitted to retain the benefits of the contract while repudiating its liability. Insured could not, by reason of the disability insured against, give notice of his condition, and no other person *volunteered* to do so.

Lastly, it is contended that interest should not have been allowed because of plaintiff's failure to prosecute the claim diligently. We are unable to say that the lapse of time between the filing of the suit and the trial was at the instance of plaintiff. It was stipulated between counsel that the cause had been continued from time to time, and term to term, from 1936 until date of trial, upon the order of the court, made by agreement of the parties. Furthermore, defendant's demurrer and other preliminary motions, filed in 1931, were still pending in 1947. The full amount of the policy, $2000, became due when insured met death by accident. It was a liquidated claim from the date defendant was notified of insured's death which, in this case, was within a few days thereafter; and interest was payable from that date. Keeton v. National Union, 182 S.W. 798; Martin v. M.W.A. 158 Mo. App. 468; 139 S.W. 231; Boillot v. Income Guaranty Company, 102 S.W. 2d, 132, l.c. 142; New York Life Insurance Company v. Griesedieck, 116 Fed. 2d, 599, l.c. 562. Judgment should be affirmed. *Bour, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.