A.W. McPHERSON, Deputy Director of the Missouri Insurance Department, Acting as Statutory Receiver, Respondent,

v.

U.S. PHYSICIANS MUTUAL RISK RETENTION GROUP, Defendant,

Elisabeth R. Sauer and Elisabeth R. Sauer, P.C., Appellants.

No. WD 59264.

Missouri Court of Appeals, Western District.

Jan. 31, 2003.

Stephen B. Millin, Jr., Kansas City, MO, for Appellant.

Karl Zobrist, Kansas City, MO, for Respondent.

Before LOWENSTEIN, P.J., SMART and NEWTON, JJ.

### Overview

HAROLD L. LOWENSTEIN, Judge.

This case touches on the seeming tension between the statutory powers possessed by receivers to wind up insolvent insurance companies and the general supervisory powers of Missouri trial courts overseeing the administration of the receivership of these companies. This case stems from a decision by a trial judge to order an audit in a four year old pending petition and case for liquidation of a Missouri insurer. A primary question is whether a court supervising an insurance

receivership can surcharge [1] one of its officers (here a special deputy receiver or SDR) who, after a court initiated statutory audit, has been found to have overcharged the receivership estate they were administering. This is an issue of first impression [2] raised by the appeals of Elisabeth Sauer and her law firm, Sauer P.C. (collectively, either "Sauer" or SDR). Sauer was surcharged by the supervising court, Judge Lee Wells, for overcharging a receivership in her role as special deputy receiver ("SDR") for insolvent defendant, U.S. Physicians Mutual Risk Retention Group (hereafter referred to as USPM). USPM insured healthcare providers. Sauer argues, among other things, that the court lacked the power, statutory or otherwise, to order surcharge. Secondarily, the SDR questions the power of the supervising trial court to order an extensive "business" or "performance" audit of a pending liquidation. The named respondent is A.W. McPherson, Deputy Director of the Missouri Department of Insurance and the statutory receiver of the insolvent insurer, who had appointed Sauer.[3] Throughout the remainder of this opinion the designation Receiver, Director and Department will be synonymous. This court holds that, though the trial court had the inherent power to surcharge and to order an audit that did more than examine numbers, its judgment must nonetheless be reversed because the court abused its discretion in failing to recuse itself.

## Legal Background

Missouri's Insurance law is generally contained in Chapter 375 and 376, RSMo 2000.[4]

In 1909, Missouri adopted its first comprehensive insurer insolvency statute. The current Insolvency Code § 375.1150 et. seq., is based on the Insurers Supervision, Rehabilitation and Liquidation Act, which went into effect in 1991.[5] Under the Insolvency Code, the Director of the Missouri Department of Insurance has a duty to regulate insurance companies for the benefit of consumers. Sometimes this requires the Director, as statutory receiver, to liquidate insolvent insurance companies. An insurer is insolvent when "it is unable to pay its obligations when they are due, or when its admitted assets do not exceed its liabilities plus the greater of: a. Any capital or surplus required by law for its organization or b. The total par or stated value of its authorized and issued capital stock." § 375.1152(13)(b). When the Director of the Department of Insurance determines an insurer is "beyond salvaging," the Director may petition the circuit court for an order to liquidate or wind-up the affairs of the company. § 375.1175. *See also* § 375.570. Under § 375.1176.1, the court will order the director to take possession and control of the assets of the insurer, and subject to the supervision of

---

1. "The imposition of personal liability on a fiduciary for willful or negligent misconduct in the administration of his fiduciary duties." Black's Law Dictionary 1441 (6th ed.1990).

2. Not just for Missouri: To date, no federal or state court has faced the issue, though many other states have insurance insolvency codes similar to Missouri's.

3. McPherson was acting head director at the time of this action. Scott Lakin is the present director.

4. Unless indicated otherwise, all statutory references are to RSMo.2000.

5. Background information comes from Walter R. Lamkin, Paula M. Young, William M. Symon, Jr. & Denise Farris, *Supervision, Rehabilitation, and Liquidation of Troubled Insurance Companies* in *Missouri Insurance Practices* 2–1 (4th ed., Missouri Bar 1990).

the court, wind-up the affairs of the company.

The Department's ample regulatory and administrative tasks prevent the Director from personally supervising every liquidation. Consequently, the Director, as statutory receiver, may—and often does with court approval—appoint SDRs who stand in the shoes of the Director, to wind-up the insurance companies. § 375.1176.2. See also § 375.650. In some receiverships, such as the one here, the SDR and the counsel are one in the same, where in others, the posts are held by separate persons or entities.

Although SDRs have the same powers as the Receiver, they do not have *carte blanche;* their administration is monitored by the supervising court, which must pre-approve many SDR actions, including compensating staff and paying administrative expenses, selling and disposing of the insolvent's assets, creating claim procedures for creditors, and bar dates for the insureds to file claims, distributing any remaining assets, and abandoning the prosecution or defense of claims deemed unprofitable. As important to the case at bar, the supervising court, pursuant to § 375.1230, has the power to order an audit of the receivership to ensure that the administration is properly proceeding.[6] In addition, it has a veto power over the appointment of an SDR and, like the Director, may unilaterally remove an SDR. This court's oversight helps minimize agency costs. As will be pointed out later, the SDR and counsel were paid on an agreed upon hourly charge.

As an attorney acting in the role of Receiver's counsel (Sauer the individual or as the only principal of Sauer, P.C.) was an officer of the supervising court. *In re Westfall,* 808 S.W.2d 829, 836 (Mo. banc 1991). Sauer, as SDR was also an officer of the court. § 375.650(2). So Sauer P.C., as Receiver's counsel, or Sauer as SDR, was an officer or agent of the court. As officers or agents of the court, Sauer had a fiduciary duty to comply with the supervising court's orders. *Vert v. Metro. Life Ins. Co.,* 342 Mo. 629, 117 S.W.2d 252, 256 (1938). SDR, as the Receiver's employee, *see Transit Cas. Co. ex rel. Pulitzer Publ'g Co. v. Transit Cas. Co. ex rel. Intervening Employees,* 43 S.W.3d 293, 303 (Mo. banc 2001), was an agent of the Receiver's and, thus, a fiduciary, as was Receiver's counsel, Sauer P.C., *Klemme v. Best,* 941 S.W.2d 493, 495 (Mo. banc 1997).

Sauer as SDR had broad powers over the receivership estate, *see* § 375.1182, thus making her a trustee, a fiduciary of all parties interested in the receivership. *See Taylor v. Mayo,* 110 U.S. 330, 334–35, 4 S.Ct. 147, 28 L.Ed. 163 (1884) ("A trustee may be defined generally as a person in whom some estate interest or power in or affecting property is vested for the benefit of another."); *Broussard v. Mason,* 187 Mo.App. 281, 173 S.W. 698, 702 (1915). As attorney, as officer of the court, as trustee for the parties interested in the receivership estate, and as agent of the Receiver, Sauer's fiduciary obligations were quite stringent. As Learned Hand noted:

> It is . . . an error to suppose that good faith will excuse derelict and negligent administration of an estate [by a Receiv-

---

6. **375.1230. Audit of receivership may be ordered, when:**

The court may, as it deems desirable, cause audits to be made of the books of the receiver relating to any receivership established under sections 375.1150 to 375.1246, and a report of each audit shall be filed with the receiver and with the court. The books, records and other documents of the receivership shall be made available to the auditor at any time without notice. The expenses of each audit shall be considered a cost of administration of the receivership.

er]. More is required than honesty; a receiver is a fiduciary, he undertakes to care for the property and manage it for creditors, to act with assiduity and with reasonable competence. If he is inert, if his conduct does not match with the least exacting standards of competence, he will be charged.... We are unwilling to set a standard [that] shall exonerate honest administration, however sluggish, however indifferent, however inconsiderate. Creditors are entitled to something more, and gentlemen who accept such positions must understand that they are to be alert and active in the business, though it proves exacting. If they are not willing to give their time to it, they had best not accept, for if they fail, they will be held accountable.

*In re C.M. Piece Dyeing Co.*, 89 F.2d 37, 40 (2nd Cir.1937). *See also Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, J.).

### Facts

On February 17, 1994, the trial court ordered the liquidation of USPM at the request of the Director. Attempts to liquidate USPM in-house failed, so Elisabeth R. Sauer, who had handled and was already serving as an SDR for other insurance receiverships, was appointed to be the SDR under § 375.1176(2). Judge Wells' court was the one supervising the USPM receivership. The court approved Sauer's employ and ordered her hourly billing rates and for the Director to pay Sauer out of USPM funds.

Sauer was originally retained as both SDR and counsel to the Receiver. At the time of the appointment, she was a solo practitioner, but in late March or early April 1994, formed Sauer P.C., which henceforth became counsel to the Receiver. The pattern of events leading to this appeal is sometimes difficult to follow.

Following a narrative of the facts, and before the analysis of the points relied on, a shortened chronology of events is presented.

Winding up the affairs of a medical malpractice insurance company is not a simple nor quickly finished task. In the case of the estate here, USPM, in addition to trial and settlement of existing claims against the insureds, there was suspicion of impropriety against the last officers and directors of the company.

During her administration of the USPM receivership, Sauer never revealed and the Department never asked how much Sauer was paying associates and paralegals. One of her workers, David Andre, was hired through a temporary agency, Of Counsel, Inc. Sauer believed that Andre's status was as an independent contractor, not her employee. Of Counsel paid Andre an hourly wage for services Andre billed to Of Counsel. While Sauer paid Of Counsel $59 per hour for Andre's services, Sauer billed the Department at the rate of $100 an hour. Sauer chose $100 an hour because Andre had more experience than an associate Sauer was paying $85 an hour and because Sauer wanted to build in the cost of overhead and training expenses related to hiring Andre. When Andre's contract with Of Counsel expired, Sauer hired Andre at $46.50 an hour and, in addition, agreed to pay for his overhead expenses.

Sauer often edited time-slips filled out by her workers. The slips were sent to the Department for payment. Before approving payment, the Department checked Sauer's bills for mathematical accuracy and for indicia of padding, such as pattern billing, consistently billing more than eight hours per day, billing in half or whole hour increments, and the like. Three employees from the Department checked the SDR's bills for accuracy. All fifty-nine

bills in the average monthly amount of $40,000 sent to the Department until June 15, 1998, were approved.

## PRO MED RECEIVERSHIP

Shortly thereafter in June 1998, Sauer informed Wells that she had recently been appointed by the Director to replace Cynthia Clark Campbell as SDR of ProMed, another medical malpractice receivership in Wells' court. Wells, *sua sponte*, ordered Sauer not to take any action in relation to ProMed without court approval. Then, on July 8, 1998, Wells telephoned an employee at ProMed and told her to bring Sauer to his chambers. When Sauer showed up, Campbell and her attorney were present. Judge Wells said that the reason for the meeting was to ensure that Sauer was disposing of the medical malpractice claims against ProMed as quickly as possible. Sauer proposed setting a final bar date, beyond which no claims could be made against ProMed, and attributed delay in handling the claims to the prior SDR's (Campbell's) allowance of claims and amendments of them after the original bar date. She proposed sending notice of this final bar date to all the claimants from whom she needed more information to grant or deny (in whole or in part) their claims.

The court rejected Sauer's ProMed proposals saying her notices wasted time; "You have a higher responsibility than following the blind orders of the Department of Insurance.... You have [a] fiduciary duty[.]"

Wells was displeased that Sauer had two or three lawyers helping her with ProMed, while Campbell had used only a paralegal; that Sauer was charging $85 an hour for the help of a second-year law student, but not paying her that; that one of Sauer's

workers, a law student, charged $340 to deliver signature cards; that Sauer had settled only three or four medical malpractice defense claims against ProMed during the time she had been administering ProMed, when there were about 140 of these claims. Wells said that sovereign or governmental immunity—which Wells scored Sauer for charging ProMed to investigate—didn't prevent the court from holding her as SDR in contempt. Sauer then offered to resign. Wells told her she could take her resignation to the Director. Sauer did not thereafter serve as ProMed's SDR.

\* \* \*

Returning to the USPM receivership, around June 16, 1998 (according to an affidavit of Sauer's), Wells ordered Sauer to submit her USPM time slips and invoices to him. SDR's monthly bills for SDR and attorney's fees, overhead, rent, supplies, travel, etc., averaged approximately $40,000 per month from April 1994 until May 1998. After June 1998, Wells refused to rule on Sauer's motions for approval of claims.

In November 1998, the court ordered an audit of the USPM receivership under § 375.1230.[7] The court instructions were that the audit was to include, but not be limited to: "(1) any accounting procedure to assess and evaluate the efficiency of all receivership personnel; (2) a review of all supporting documentation for time spent on all receivership affairs; (3) an analysis of the total cost to the receivership estate for execution of the partial distribution to Class 2 creditors upon application to this [c]ourt; and, (4) an accounting of all receivership receipts and expenditures including examination of all supporting docu-

---

**7.** There is no reported Missouri case concerning a trial judge ordering an audit of an SDR.

Insurance cases from other jurisdictions are silent.

mentation." Wells' order of an audit named Mark Vianello, CPA to conduct the audit.

Without approval from the Department, Sauer hired legal representation to represent her and Sauer P.C.'s employees in the audit matter. In December 1998, the Director–Receiver moved to disqualify the outside auditor, to compel him to conduct the audit within the "statutory scope," to allow the Receiver ninety days after the filing of the report to respond, and to hold a hearing on the audit report no sooner than thirty days after the due date for the Receiver's response to the audit report. On March 4, 1999, the court granted the Receiver's motion for time to respond to the report, giving the Receiver thirty days; but denied, without hearing, both the motion to disqualify the auditor and the motion to compel the auditor to narrow the scope of his audit. Before making these rulings, Wells met with the auditor (according to an invoice for payment submitted by the auditor). Neither Sauer nor the Receiver was present; nor had they received notice of the meeting.

Throughout the audit, the court denied the Receiver and Sauer's request for notice of when the auditor was to interview Sauer's former employees. Wells told Sauer, as counsel to Receiver, to not be present at the interviews. The auditor sent the court letters about the audit, including one discussing the "path" of the audit.

In April 1999, the auditor delivered a draft copy of his audit report to Wells. Five days later, the two had a three-hour meeting about the report (according to one of the auditor's invoices). That month, the Director terminated Sauer as SDR and Sauer, P.C. as general counsel. Sauer notified the court of her withdrawal and attempted to speak with Judge Wells. The court told Sauer it could not talk to her without noticing all parties.

On May 5, 1999, the auditor filed his 247–page report and accompanying exhibits with the court, which ordered them held *in camera* and only shown to counsel. The court gave Sauer copies of the report and exhibits the same day.

The audit report stated that the audit's goal was "to conduct an investigation [for] the court [to assess] the manner in which the Receiver and the [SDR] have operated the receivership." To that end, the auditor examined the financial records of the receivership and the files of cases in which USPM was either plaintiff or defendant and interviewed Sauer and her former employees and independent contractors. The goal of the interviews was to investigate allegations of billing irregularities; to get information about the financial effect of transactions, including claims against and by USPM; and to gauge Sauer's efficiency in administering the receivership. The auditor also reviewed the bills Sauer sent to the Director to determine the projects Sauer's employees worked on, the hours spent per project, and the total costs of each project.

The report charged Sauer with "systematically drain[ing] the estate for her personal benefit" of over $2 million since March of 1994. Of the $2 million, $588,725 was attributed to Sauer's alleged failure to expeditiously handle a USPM reinsurance claim. Another purported instance of negligence: Sauer didn't file a motion for summary judgment in a directors and officers lawsuit. Sauer also allegedly overcharged USPM. For instance, while charging USPM $100 per hour for the services provided by David Andre, Sauer paid him only $59 per hour (from October 1, 1994, to October 7, 1995) and $46.50 per hour (from October 8, 1995, to June 30, 1997). She also charged for two temporary employees

at a higher rate than she paid them, thus, the report alleged, damaging USPM in the amount of $15,355. Hundreds of thousands of dollars wasted was traced to paralegals performing administrative tasks—e.g., opening the mail, answering the phone, and typing. The auditor found $7900 worth of phantom services, services billed but not provided, by comparing Sauer's invoices with carbon copies of phone messages from employees that said they were going to come in to work late. The auditor alleged that Sauer padded her bills by adding time or fabricating services. The report pegged the total SDR overcharge to the USPM estate at $773,917.

In a somewhat surprising move, the day the report was filed, Wells wrote to the Director, reprimanding him for firing Sauer without hearing first consulting him. *Citing State ex rel. Angoff v. Wells,* 987 S.W.2d 411 (Mo.App.1999), Wells asked the Director to explain why he terminated Sauer.[8]

Sauer unsuccessfully moved to intervene in the audit proceeding, and, from May to July 1999, filed a medley of motions. She moved for time to respond to the report and to allow an expert accountant to review it. On May 5, 1999, she moved to disqualify Judge Wells under § 508.090(1) and Rule 2, Canon 3(E)(1)(a). She claimed (1) the judge was biased against her because of her attempt to replace Cynthia Clark Campbell as Receiver in the ProMed receivership and (2) that a reasonable person might view the audit as the product of a power struggle between the judge and the Department. She moved to strike the audit report as being unauthorized; for violating her due process rights, because Judge Wells appeared to participate in the

audit via *ex parte* conferences with the auditor; for being the product of an unqualified auditor; for containing inadmissible hearsay; and for being defamatory and baseless. In late May, Sauer moved for permission to conduct discovery.

Sauer also moved the court to hold a hearing on the audit report. The motion was granted. Denominating Sauer a "defendant," but never formally affording her party status, the court granted Sauer time to respond to the audit report, giving her nearly thirty days to respond. Sauer filed a notice of commencement of discovery soon thereafter.

On June 8, 1999, the court, in reference to the questions raised by the audit report, appointed an attorney to "represent and aid [the] creditors of USPM in the conservation and protection of assets of the receivership," with those attorney's fees to be paid from the USPM receivership.

On July 7, 1999, Receiver's counsel filed with the court its suggestions in opposition to Sauer's motion to intervene. Counsel argued that intervention was improper because Sauer had already been allowed to respond to the audit report. Later that day, the court denied Sauer's motion to intervene and her recusal and discovery motions, concluding that she did not have standing.

Sauer then moved for approval and payment of the attorney's fees she incurred from January 1999 to April 29, 1999—a total of $168,684.62—and again moved for change of judge. The Receiver told the court that it was going to refrain from allowing or denying Sauer's claims for payment for services provided from January through April 1999 until the court had

---

**8.** Wells was consistent in taking the position that the Director could not unilaterally terminate the SDR. The Angoff above citation was the culmination of a successful case by the

Director to prohibit Wells from keeping the director from unilaterally terminating Campbell as Pro-Med's SDR.

resolved all the questions raised by the audit. Starting in May 1999 (according to the invoices filed *in camera* with the court and included in respondent's legal file), Receiver's counsel periodically met with Wells. Sauer was never notified of the meetings. During oral arguments before this court, Receiver's counsel said that the judge had asked him to meet with him, but that he turned down the judge's offer, because of ethical concerns. Judge Wells' response: "You come back and talk to me after Labor Day."

Sauer sought a writ of prohibition on July 23, 1999, to order the court to vacate the orders denying Sauer's motions to intervene, to disqualify Wells, to gain access to the audit records and USPM records, and to conduct discovery. The writ was denied.

On May 23, 2000, Wells called the Receiver's counsel (according to the invoices of Director's counsel). Eight days later, the Receiver moved the court "to issue a final order approving payment of the former SDR or, alternatively, surcharging the former SDR for breach of her duty of care, and to enter judgment against her for the difference between the total amount of legal, administrative and other fees and expenses paid to date and the reasonable value of the actual services rendered." There was no mention of assessing audit costs or attorney fees against the SDR. The Receiver estimated that Sauer owed a minimum of $228,550.70.

On July 24, 2000, Sauer's counsel was allowed to submit interrogatories and to conduct depositions. Receiver's counsel tried to halt discovery, but Wells ordered it to continue.

For ten days in August 2000, the court held a bench trial of "all issues" raised by the audit. The judgment under review here was entered against Sauer and Sauer, P.C. in favor of the Receiver, assessing $771,752.95 in "damages." Of the $771,752.95, $162,527 was for overcharging for the services of David Andre, who the court concluded was not an employee, thus requiring Sauer to bill only for the actual expenses of hiring Andre; $21,687.50 was for time added to the final invoices but not included in the draft invoices; $136,488.75, for falsified time entries made by two of Sauer's workers; and $11,905.75, for entries included in the final invoices but not in the draft invoices.[9] The court also assessed $439,144.55 in damages, representing the costs of the audit and the attorney's fees incurred by the Receiver since June 2000, and an indeterminate amount of fees and expenses "related to the [a]udit [r]eport" incurred since June 2000.

The court denied Sauer, P.C. and Sauer's request for attorney's fees as Class 1 expenses of the receivership for pre-termination services provided from January to April 1999; their request for reimbursement for hiring attorneys to represent them during the audit-related hearing; and their attorney's fees for services performed after termination. The court also denied their request for indemnification.

Though finding Sauer in breach of her fiduciary duty of care both as SDR and as counsel to USPM, the court concluded there was insufficient evidence to find that Sauer intentionally or deliberately misled the Receiver. The judgment stated that there was no just reason to delay appeal.

The following is a summary of pertinent events geared to the two issues presented in this appeal (jurisdiction for surcharge audit, and recusal).

---

9. An attorney hired by the SDR and several others on her staff obtained immunity before answering questions about their duties and time sheets.

| | |
|---|---|
| 1994 March – | Sauer appointed SDR of USPM |
| 1998 January – | Bar complaint on SDR's upward billing adjustments |

May– Receiver terminates Campbell as SDR of ProMed (also in Wells' court). Results in Receiver's obtaining writ in prohibition that Wells, as supervising court, could not unilaterally block a Receivers replacement of an SDR. (*Angoff v. Wells*, 987 S.W.2d 411 (Mo.App.1999).

June – SDR appears before Wells and announces she has been appointed ProMed's SDR. Court denied, saying her malpractice insurance should be paid up. Court then requests from SDR itemized billings for USPM and three other receiverships for which she was also an SDR. (Court approves no SDR's bills for USPM after this date).

July – Hearing on ProMed. Court indicates he wants both estates to conserve assets for creditors of both insurance companies. Court refuses to ratify appointment of Sauer for ProMed, noting "duplicative work" of Sauer.

September – Sauer resigns as ProMed's SDR.

November – Court, pursuant to 375.1230, orders audit of USPM to "preserve assets" of and to "protect creditors" by reviewing "all supporting documentation for time spent on all receivership affairs." Order appoints auditor with costs to be "an administrative expense of the receivership."

December – Receiver, joined by SDR, files motion which is denied, for a protective order and asks replacement of auditor who has "harassed" SDR's employees.

1999

January (early) – Auditor contacts SDR's employees setting up interviews.

January 22 – Court, in response to SDR's letter, tells her not to be present at employee interviews with auditor. Also states employees may bring an attorney to their interview with the auditor.

April – Receiver letter to SDR asking about 1998 bar complaint and why USPM 1998 time slips could not be found and questioned about attorney Andre payments. Sauer terminated as SDR by Receiver, (claiming she is spending too much time on audit and not enough on closing) and she then resigns as counsel for USPM.

May – Audit report filed. It cites billing irregularities dating from 1994, for overcharges and false time entries filed. Sauer motion to intervene, for hearing on audit and second attempt to recuse and disqualify Wells from audit proceeding. SDR attaches a list of ex parte contracts between court and auditor prior to filing of audit. Also makes extensive references to ex parte contracts between court and Receiver's counsel.

June – Sauer files third motion for ruling on disqualification and recusal.

July – Court denies Sauer's motion to intervene and for disqualification and recusal. SDR's attempt to disqualify via writ denied.

December – Sauer files a motion for unpaid SDR fees (including increase in hourly rate) and her attorney's fees from January 1999, in audit matter.

2000

May – Receiver files motion for Final Compensation order for Sauer. Motion raises issue of surcharge for up to $228,000 (which includes Andre matter).

August – Hearing on audit report resulting in judgment surcharging SDR.

November – Judgment. As pertinent: Sauer's pending motions of December 1999, for: 1) fees and expenses of $166,377 from January to April 1999, were denied because of violations of fiduciary and statutory duties as well as neglect in management of estate; and 2) fees and expenses from May to November 1999 ($159,683), and increase in hourly rate were denied because she was not the SDR after April 1999. Receiver to recover from SDR $162,527 on Andre contract; $21,687 for time added on final invoices; $136,488 for false time entries by Wisner and Lascon, and $11,905 for additional added time entries, for a subtotal of $332,607. Total of then tabulated Audit-related costs of $439,144 (attorney's fees of Morrison & Hecker, $6,614, and $88,575 of Blackwell Sanders and, auditor's allowed fee of $334,954), were incurred because of SDR's failure to supervise and administer the receivership and failure to carry out fiduciary responsibilities those expenses were surcharged to the SDR to be paid by her to the Receiver. Total amount of the judgment was $771,000.

## Analysis of Points on Appeal

## I. CAN THE SUPERVISING COURT IN A LIQUIDATION OF AN INSOLVENT INSURER SURCHARGE AN SDR–COUNSEL?

### A. Inherent power to surcharge

If a supervising trial court does not have the power to surcharge an SDR or attorney, the other issues, are moot.

In its final order surcharging Sauer, the court traced its power to surcharge from that power of the Receiver to § 375.1230 and to its inherent powers. While § 375.1230 allows the court to audit an SDR, it does not authorize a surcharge. In general, the power to investigate does not include the power to prosecute. Because of the receivership court's supervisory obligations, respondent argues, the court had the implied power to surcharge. See *Gerlach v. Mo. Comm'n on Human Rights*, 980 S.W.2d 589, 592–93 (Mo.App. 1998) (receivership court has implied power to subpoena documents, though word "subpoena" is not used in statute). But implied powers are only those necessary for the exercise of express statutory powers. *Missouri Ethics Comm'n v. Wilson*, 957 S.W.2d 794, 798 (Mo.App.1997). Successful investigation does not require prosecution. Section 375.1182.1(2) allows the supervising court to approve payment of fees and expenses submitted by an SDR; but the power to give doesn't include the power to take away. So the Receiver's reliance on *Scheufler v. Continental Life Insurance Co.*, 350 Mo. 886, 169 S.W.2d

359 (1943), and *Robertson v. Manufacturing Lumbermen's Underwriters,* 346 Mo. 1103, 145 S.W.2d 134 (1940), is unavailing. Both dealt with attorneys who felt the supervising court had awarded insufficient attorney's fees, *Scheufler,* 169 S.W.2d at 363; *Robertson,* 145 S.W.2d at 136–37, whereas this case involves the imposition of liability for monies already received—a very different thing.

Section provides that "the liquidator," undefined by the Insolvency Code, "shall have the power ... to institute in the name of the insurer or in his own name any and all suits *and other legal proceedings* ...." § 375.1182.1(12) (emphasis added). Because the order to liquidate makes the Director (and his successors) "liquidator," § 375.1176(1), it appears that the Director could request a surcharge by motion, since § 375.1182.1(12) is not limited to suits, but includes all other legal proceedings, arguably including surcharge hearings. It is unclear whether the term "liquidator" means only the Director or also the SDR, who carries out the day-to-day liquidation of the insurance company. In any event, even if the Director is "the liquidator," the statute concentrates on actions by the receivership against third parties, not the SDR. *See infra.* The Insolvency Code, implied powers and caselaw are all weak reeds upon which to base the court's actions.

■ Courts as arms of the judicial branch have inherent powers. *State ex rel. Robinson v. Hartenbach,* 754 S.W.2d 568, 571 (Mo. banc 1988). These powers do not derive from statutory authority. *State ex rel. Cain v. Mitchell,* 543 S.W.2d 785, 786 (Mo. banc 1976). These inherent powers confer judicial independence from executive or legislative control in four separate, but not mutually exclusive, areas: separation of powers, logistical support, court governance, and implementation of the adjudicative function. FELIX F. STUMPF, INHERENT POWERS OF THE COURTS: SWORD & SHIELD OF THE JUDICIARY 2 (1994). The last two areas are implicated in this case.

■ A trial court has a broad array of inherent powers. It may, *e.g.,* dismiss for failure to prosecute, *Limpus v. New York Life Ins. Co.,* 241 Mo.App. 27, 226 S.W.2d 97, 98 (1949); vacate judgments acquired by fraud, *William H. Johnson Timber & Realty Co. v. Belt,* 329 Mo. 515, 46 S.W.2d 153, 155 (1932); amend a judgment on a finding of good cause, *Stroup v. Leipard,* 981 S.W.2d 600, 603 (Mo.App.1998); remand a case to prevent a miscarriage of justice, *State v. Ramsey,* 874 S.W.2d 414, 417 (Mo.App.1994); allow or compel a set-off when sitting as a court of equity, *Chaney v. Cooper,* 948 S.W.2d 621, 624 (Mo. App.1997); compensate a guardian *ad litem, Leimer v. Leimer,* 715 S.W.2d 310, 313 (Mo.App.1986); award attorney's fees in an action to establish paternity and fix child support, *Parker v. Bruner,* 692 S.W.2d 379, 382 (Mo.App.1985); expunge from its records a void judgment, *Healer v. Kansas City Pub. Serv. Co.,* 251 S.W.2d 66, 68 (Mo.1952); and order restitution of money paid because of an incorrect judgment, *State ex rel. Util. Consumers' Council of Mo., Inc. v. Public Serv. Comm'n,* 585 S.W.2d 41, 59–60 (Mo. banc 1979). Trial courts have used their inherent powers to control the conduct of their officers. *Petition of Fl. Bar,* 61 So.2d 646, 647 (Fla.1952).

■ Strict necessity is not a prerequisite to invoke these powers. *See, e.g., Limpus,* 226 S.W.2d at 98. Convenience and suitability can ground inherent powers. *Clark v. Austin,* 340 Mo. 467, 101 S.W.2d 977, 988 (1937) (Ellison, C.J., concurring). The perceived need to streamline the judicial process has been enough to justify recourse to a court's inherent

powers. *See, e.g., Dale M. ex rel. Alice M. v. Board of Educ. of Bradley–Bourbonnais High Sch. Dist. No. 307,* 282 F.3d 984 (7th Cir.2002); *SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985); *Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 564 (3rd Cir.1985).

A prominent use of inherent power to streamline litigation was upheld by the Seventh Circuit. *Dale M., ex rel. Alice M. v. Board of Educ. of Bradley–Bourbonnais High Sch. Dist. No. 307,* 282 F.3d 984 (2002). In *Dale M.,* the court affirmed the district court's order to an attorney to return attorney's fees that his client had been awarded and had turned-over to the attorney, when the underlying judgment was reversed. *Id.* at 985–86. Admittedly, the party wronged by the judgment could have brought a suit in restitution against the attorney's client, who in turn could have sued the attorney for recoupment on the theory of unjust enrichment. *Id.* at 986. But the court concluded that it was proper for the district court, exercising its inherent powers, to forego such circuitry by ordering the attorney to remit the money directly to the wronged party. *Id.*

■ The U.S. Supreme Court has endorsed the use of inherent powers to avoid "extensive and needless satellite litigation." *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 51, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). However, because "[i]t is only one short step from the assertion of inherent power to the assumption of absolute power," *State ex rel. Selleck v. Reynolds,* 252 Mo. 369, 158 S.W. 671, 681 (1913) (Brown, J. concurring), rarely should a court invoke its inherent powers. *Higgins v. Dir. of Revenue,* 778 S.W.2d 24, 26 (Mo.App.1989).

The Director, as respondent, claims that, without the power to surcharge, a trial court would not be able to rectify ills that the Insolvency Code was designed to prevent. It is true that it would be more difficult. If the court lacked a surcharge power, the only impetus for relief could come from creditors of the company. Such action would be attenuated because the receivership's creditors would have a weak incentive to file suit if their claims were for minor sums. It is essential for a trial court to have the power to surcharge, lest the assets of a mortally wounded insurance company be frittered away. By giving the court supervisory authority over receiverships, the legislature generally intended the court to prevent this unreasonable outcome. *See Abrams v. Ohio Pac. Express,* 819 S.W.2d 338, 341 (Mo. banc 1991) (statutes are to be interpreted to avoid unreasonable results).

Although, the Supreme Court of Missouri has never held that a trial court has the power to surcharge an SDR, in *Lucas v. Manufacturing Lumbermen's Underwriters,* however, the Court did tacitly approve of a receivership court surcharging a Superintendent of Insurance (now the Director of Insurance) for exceeding the scope of his authority, thus implying that a separate suit in a separate court was unnecessary. 349 Mo. 835, 163 S.W.2d 750 (1942). In *Lucas,* the Superintendent of Insurance (Robertson) filed exceptions to the former superintendent's report of the expenses incurred by the former superintendent in handling the affairs of an insurance company that was placed in temporary receivership. *Id.* at 752. The former superintendent was temporarily placed in charge of the insurance company. *Id.* at 756. A court order authorized the former superintendent to pay employees. *Id.* at 755. The court was unable to rule on the propriety of either attempting to liquidate or rehabilitating the insurance company because of bankruptcy petitions, voluntary and involuntary, filed in federal court and because of a pending motion for change of venue. *Id.* at 755. Besides collecting premiums and processing claims and paying

employees, the former superintendent entered into a reinsurance agreement to maintain the *status quo*. *Id.* at 756–57. Citing a public policy favoring rehabilitation, the Court reversed the surcharge because it held that the former superintendent's actions were within the scope of his authority. *Id* at 759.

If a surcharge action in *Lucas* brought within the ambit of the receivership proceeding, as opposed to a separate lawsuit, was improper, the Court's prolonged discussion of the former superintendent's authority to reinsure and to pay employees was otiose. If the trial court didn't have jurisdiction to surcharge, the Court had an obligation to raise the issue *sua sponte*. *Commercial Bank of St. Louis County v. James*, 658 S.W.2d 17, 21 (Mo. banc 1983). It didn't.

This court sees no distinction between filing exceptions to a final report of a receivership, as was done in *Lucas*, and the Receiver's request for a hearing on the audit report, with the possibility of a surcharge, as was done here.

■■ The power to impose a restitutionary surcharge is similar to two inherent powers that courts definitely have. A court has the power to order a party who received money under a mistaken judgment to disgorge it. *See State ex rel. Util. Consumers' Council of Mo., Inc. v. Pub. Serv. Comm'n*, 585 S.W.2d 41, 59–60 (Mo. banc 1979). There is no reason why a supervising court can't do the same when an SDR wrongfully retains money paid over without final court approval. The reliance interests of a surcharged SDR are weaker than those of a party who has executed on a judgment later deemed mistaken. A court also has the inherent power to sanction bad faith litigation misconduct. *Rea v. Moore*, 74 S.W.3d 795, 799–800 (Mo.App.2002) (*per curiam*).

Other jurisdictions have recognized the inherent power to surcharge. The Sixth Circuit noted that a district court has "broad powers and wide discretion" deriving from the court's inherent power to fashion relief in an equity receivership proceeding. *S.E.C. v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir.2001). It may adopt summary processes, "including the use of single receivership proceeding to resolve all claims." *Id.* "Such abbreviated procedures ... advance the government's interest in judicial efficiency by reducing the time needed to resolve disputes, decreasing the costs of litigation, and preventing the dissipation of the receiver's assets." *Id.*

Many state decisions say the same. The Supreme Court of Oregon affirmed a trial court's order that demanded that a former receiver repay money mistakenly paid to him and that barred any further payments to the former receiver for services performed until he complied with the court's order. *Weber v. Empire Holding Corp.*, 149 Or. 503, 41 P.2d 1084 (1935). The court stated, "That a court appointing a receiver has the unquestioned authority and it is its duty to compel a receiver, who has embezzled funds in his possession or wrongfully applied them to an improper or unauthorized use, to return the funds is beyond controversy." *Id.* at 1087. In a similar context, the Hawaii Supreme Court averred that "[I]t can scarcely be doubted" that a trial court has the inherent power not only to impose a surcharge on but also to remove a trustee that has breached his fiduciary duties. *In re Holt's Trust Estate*, 33 Haw. 352, 355–57 (Haw.Terr.1935). "To hold otherwise would be to place an unwarranted and dangerous limitation upon the great powers which courts of equity have over trust estates." *Id.* "A receiver ... is a fiduciary who, as an officer and representative of the court, acts for the benefit of all persons interest-

ed in the property ... [and] may be surcharged ... for a failure to properly carry out the duties imposed by the order of appointment." *Shannon v. Superior Court.*, 217 Cal.App.3d 986, 266 Cal.Rptr. 242, 245–46 (1990). *See also Aviation Brake Sys. Ltd. v. Voorhis*, 133 Cal.App.3d 230, 183 Cal.Rptr. 766, 769 (1982) ("[U]pon the receiver's final report and account, the receiver in his personal capacity may be surcharged for losses to the receivership estate based upon misconduct or mismanagement"); *N & G Taylor Co. v. Berger*, 49 F.Supp. 524, 526 (D.Penn.1943) ("An equity receiver who pays himself ... without authorization [in good faith] does so at his own risk" and may be surcharged); Clark on Receivers § 419 (1969 ed.).

If the Insolvency Code only allowed a separate lawsuit brought by the Director of Insurance, the purported surcharge of Sauer was a nullity. *See State ex rel. ISC Fin. Corp. v. Kinder*, 684 S.W.2d 910, 913 (Mo.App.1985). Sauer argues that the Insolvency Code implicitly stripped the supervising court of a surcharge power because, while it explicitly grants a broad array of powers to the receiver, it says nary a word about the supervising court's surcharge power. Section 375.1182 gives the Receiver (*see* § 375.1176.1) the power to audit the books of all agents of the insurer, § 375.1182.1(5); to file suits in the name of the insurer or in his own name, § 375.1182.1(12); and to "prosecute any action which may exist on behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer, or any other person," § 375.1182.1(13). It also gives the Receiver "all powers now held or hereafter conferred upon receivers by the laws of this state[.]" § 375.1182.1(22). Because the Receiver has these broad powers and the Code doesn't mention any similar judicial powers, it seems that the Receiver must initiate a separate action to recover any monies wrongfully retained by Sauer.

Laying aside the argument that § 375.1182.1(12) seems to prove the opposite, Sauer's claim nonetheless fails. First, § 375.1182.1(12)-(13) seems to deal with suits by the liquidator against third parties, not against those administering the receivership. Section 375.1182.1(12) deals with the continuation the prosecution of suits that predated the petition to liquidate; and § 375.1182.1(13) of prosecuting suits "on behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer, or any other person." The comma in § 375.1182.1(13) suggests that the "any other person" phrase is the object of the prepositional phrase "on behalf of," which means that § 375.1182.1(13) does not anticipate suits by the Receiver, as liquidator, against anyone except the officers of the insurance company. This is unlikely. Alternatively, if the comma was added because of a scrivener's error, then, applying *ejusdem generis,* § 375.1182.1(13) allows suit against any other person who is like the officer of the insurance company—a third party, not an SDR.

To be sure, *State ex rel. Missouri State Life Insurance Co. v. Hall* seems to support Sauer's argument. 330 Mo. 1107, 52 S.W.2d 174 (1932). In *Hall,* the state sought a writ prohibiting the trial court from appointing an operating receiver, a temporary receiver. *Id.* at 176. The Insolvency Code then, as now (*see* § 374.010), charged the insurance department with "the execution of all laws now in force, or which may be hereafter enacted." *Id.* (citing Mo. St. Ann. § 5670 (since repealed)). The judge argued that he had the power to appoint an operating receiver because the Code was silent about the appointment of one. *Id.* at 177. The court disagreed. *Id.* It stated: "The enactment

of this comprehensive Code made the state a real party in interest. The superintendent of insurance [the former name for the Director of Insurance] is the administrative officer, in charge of that interest, and courts are without authority to interfere with his administration of the Code." *Id.*

Nonetheless, *Hall* doesn't preclude a finding of inherent power to surcharge. Of paramount importance, the Court did not reject the trial court's general contention. Its justification for making the writ absolute was that "[i]nsurance companies exist and thrive on public confidence" and that the appointment of an operating receiver "would destroy that confidence." *Id.* That is, the trial court's inherent power to appoint a temporary receiver cannot frustrate a key objective of the Insolvency Code shoring up confidence in the insolvent insurance company. Here, disallowing a surcharge of the SDR would reduce the amount of recovery by creditors of USPM. Conversely, allowing a surcharge would signal to future receivers that they best pursue their responsibilities carefully and diligently. The institutional capacity concerns underlying *Hall* are not present in this case. While the Department may have a better insight into the necessity of a receivership, given its agency expertise, it in no way follows that requiring the Receiver to file a separate lawsuit would better further the objectives of the Insolvency Code.

It is also important that the Receiver and supervising court were of one mind about the propriety of a surcharge hearing before the court. This was not true in *Hall,* where the court and the Receiver were at loggerheads over appointment of an equity Receiver. 52 S.W.2d at 174.

That § 375.1230 requires a copy of the audit report be filed not only with the Receiver but also with the court bolsters the conclusion that a trial court may surcharge an SDR. If the legislature had intended to repose the remedy of surcharge solely in the Receiver, requiring the auditor to provide a copy of the audit report to the court would make little sense. For, if the Receiver decided that a surcharge was inappropriate or unnecessary, the court could do nothing with the report.

■ The very silence of the Insolvency Code argues in favor of the existence of the surcharge power. "While the provisions of the [I]nsolvency [C]ode do indeed prevail over the common law and any general statutes, ... [w]here the insolvency code is silent, the common law and general statutory authority should be applied." *Transit Cas. Co. ex rel. Pulitzer Publ'g. Co. v. Transit Cas. Co. ex rel. Intervening Employees,* 43 S.W.3d 293, 303 (Mo. banc 2001). The Insolvency Code authorizes civil actions, § 375.1182.1(12)-(13),

■ The power to compel an SDR to disgorge unjustified fees bears a resemblance to civil contempt, an inherent judicial power. *State ex rel. Robinson v. Hartenbach,* 754 S.W.2d 568, 571 (Mo. banc 1988). The goal of civil contempt is remedial, not punitive, *Teefey v. Teefey,* 533 S.W.2d 563, 565 (Mo. banc 1976), just as the goal of the surcharge here, taking the form of restitution, is to prevent an SDR from reaping a windfall. But the court's order was not explicitly aimed at Sauer. It ordered the Department to pay Sauer according to Sauer's terms; it didn't directly order Sauer to accept payment only for work performed according to these terms. (As a fiduciary, of course, Sauer had an obligation to remit any overpayment.) In any event, while compensatory contempt (ordering a contemnor to compensate a party for losses caused by contumacious conduct) was theoretically available, *K. Khan, Inc. v. Wortham,* 983 S.W.2d 539, 541 (Mo.App.1998), nothing requires a court to exercise its contempt

power instead of imposing remedial sanctions. *See Chambers,* 501 U.S. at 46, 111 S.Ct. 2123 ("The imposition of sanctions ... transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.' "). *See also Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764–65, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

It would be perplexing for the court not to have the authority to command its officer (the SDR is an officer of the court), § 375.650.2, and its agent, *see State ex rel. Weber v. Vossbrink,* 333 S.W.2d 298, 302 (Mo.App.1960) (equating officer of court and agent of court), to make restitution; a key element of agency is relinquishment of control to the principal. *Constance v. B.B.C. Dev. Co.,* 25 S.W.3d 571, 587 (Mo. App.2000). *See also State v. Wobler,* 10 Ohio App.3d 155, 461 N.E.2d 927, 929 (1983) ("A court has the inherent power to direct the officers of that court to perform their duties."); *Ex parte Cross,* 247 Ala. 85, 22 So.2d 378, 383 (1945) (same). *Cf. U.S. v. Bell,* 120 F.Supp. 670, 672 (D.D.C. 1954) (court has inherent power "to discipline one of its officers whenever he has in his possession or under his control any property illegally withheld from its owner").

■ This court holds that a trial court supervising an insurance company in receivership under the Insolvency Code has the inherent power to surcharge an SDR to prevent unjust enrichment when the Receiver requests a surcharge.[10]

**B. Extent of surcharge**

While the trial court did have the inherent power to surcharge Sauer in the form of restitution, its award of the auditor's costs and expenses and Receiver's counsel fees incurred since July 1999 was erroneous.

■ Missouri, with few exceptions, follows the majority American rule that litigants pay their own attorney's fees. *David Ranken, Jr. Technical Inst. v. Boykins,* 816 S.W.2d 189, 193 (Mo. banc 1991), *overruled on other grounds, Alumax Foils, Inc. v. City of St. Louis,* 939 S.W.2d 907 (Mo. banc 1997). A court has the inherent power to sanction bad faith conduct, *Rea v. Moore,* 74 S.W.3d 795, 801 (Mo.App.2002), probably by way of awarding attorney's fees, *see Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), on analogy to the power to award attorney's fees related to prosecuting a contemnor. *See Reed v. Reed,* 10 S.W.3d 173, 182 (Mo.App.1999). But it may do so only when the sanctioned party acted in bad faith. *Chambers,* 501 U.S. at 45–46, 111 S.Ct. 2123. Here, however, the trial court found there was insufficient evidence to conclude that Sauer acted in bad faith. The award of attorney's fees was thus impermissible, unless there was statutory authority for the court's action. There wasn't.

■ The costs of the audit were also improperly awarded. Courts do not have the inherent power to award costs. *Wirken v. Miller,* 978 S.W.2d 60, 63 (Mo.App. 1998). *A fortiori,* courts cannot award

---

**10.** Sauer P.C. did not argue on appeal that the court could not surcharge it because all the harm to SDR stemmed from the acts (or omissions) of the SDR or that the SDR's actions were beyond the scope of her authority as an agent for Sauer P.C. This court, exercising its discretion under Rule 30.20, decides not to review for plain error; and does not decide whether the surcharge of Sauer P.C. was error.

costs when a statute § 375.1230 provides that costs are to be taxed to the receivership. Again, costs can be imposed as a sanction, but not without a finding of bad faith. *Chambers*, 501 U.S. at 48, 111 S.Ct. 2123.

Yet another reason the Receiver attorney's fees and the audit costs should not have been assessed against the SDR is that Receiver's counsel candidly admitted during oral argument that the fees and costs "were not specifically requested," and that if there was any concern, the Receiver was "willing to have the court vacate" those portions of the judgment.

### C. Immunity

Sauer argues that either § 375.650(2) or § 375.1182.5—the two immunity provisions in the Insolvency Code [11]—immunized her from liability for the acts and omissions upon which the court based its surcharge because they were committed in the performance of her duties as liquidator of USPM. "The ... special deputy ... when acting with respect to the liquidation shall enjoy absolute judicial immunity and be immune from any claim against [her] personally for any act or omission committed in the performance of [her] functions and duties in connection with the liquidation." § 375.1182.5. On its face, the statute's absolute language ("absolute judicial immunity" from "any claim" for "any act or omission") seems to preclude holding an SDR personally liable. Sauer reads § 375.1182.5 as literally providing "absolute judicial immunity." She is mistaken.

 The purpose of the immunity statute is not to protect receivers (and, derivatively, SDRs) from court-imposed surcharges, but rather to prevent receivers (and SDRs) from becoming "a lightening rod for harassing litigation." *Kermit Constr. v. Banco Credito Y Ahorro Ponce-no*, 547 F.2d 1, 3 (1st Cir.1976). "[T]he receiver functions as an arm of the court by making decisions about the operation of a business that the judge otherwise would have to make." *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298, 1303 n. 6 (9th Cir.1989). Immunity, then, is designed to ease compliance with judicial orders by barring *third parties* from hindering an agent of the court when the agent is complying with court orders, not when the agent evades the spirit of those very orders.

 Section 375.650 provides two kinds of immunity—absolute judicial immunity and personal immunity. *Avidan v. Transit Cas. Co.*, 20 S.W.3d 521, 525 (Mo. banc 2000). The former, according to the SDR is enough to insulate her from liability. But she misreads the statute. There is "absolute judicial immunity" but only "for any act or omission committed in the performance of [her] functions and duties in connection with the liquidation." *See* § 375.650(2). No doubt it is possible, under the last antecedent rule, *see Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215–16 (2nd Cir.1999), that the prepositional phrase only applies to personal immunity. But the rule is not absolute and a better explanation for inapplicability of the phrase to absolute judicial immunity is that judicial immunity presupposes what the prepositional phrase requires. *See State ex rel. Bird v. Weinstock*, 864 S.W.2d 376, 382 (Mo.App.1993) (noting that Supreme Court of Missouri has interpreted common law doctrine of judicial immunity as extending only to the

---

**11.** The latter is particular to liquidations, while the former, § 375.650(2), applies to all receivership proceedings. The only substantive distinction is that the former explicitly makes good faith a prerequisite for immunity. Because Sauer's good faith is irrelevant to the analysis, *see infra*, only § 375.1182.5 is cited to ease readability.

particular functions of the judicial office, and not the office itself). Either way, the result is the same: no immunity for acts beyond the scope of one's authority.

Context supports this interpretation. *See J.B. Vending Co. v. Dir. of Revenue,* 54 S.W.3d 183, 187 (Mo. banc 2001). The juxtaposition of an immunity provision and the provision making the SDR an officer of the court, § 375.650.2, suggests that the SDR is immune only when doing acts that are those the court, or some other agent, would otherwise have to do itself.

The SDR's interpretation would confer an unfettered license upon the Receiver (or, here, the SDR). For, while the court could use its contempt power to enforce compliance with its orders, it would be a dicey issue whether criminal contempt would be the only available check on the SDR's actions. This interpretation also undercuts her claim that the court may not surcharge an SDR because § 375.1182.1(12)-(13) provides the only proper remedy for breach of fiduciary duty by an SDR, namely, a separate lawsuit by the Department. A lawsuit wouldn't lie under Sauer's reading of the immunity statute.

A state insurance receivership proceeding is similar to a federal bankruptcy proceeding: both the bankruptcy trustee and the Receiver (or SDR) have fiduciary obligations to the estates they are administering. As a trustee may be held personally liable for breach of these duties, *Mosser v. Darrow,* 341 U.S. 267, 274, 71 S.Ct. 680, 95 L.Ed. 927 (1951), so should an SDR.

As a codification of the common law, § 375.1182.5 allows the court to hold an SDR liable for any acts beyond either statutory or judicial authority. The extent of this immunity was elaborated by the Wyoming Supreme Court in *Krist v. Aetna Casualty & Surety,* 667 P.2d 665, 667–69 (Wyo.1983). There, a successor receiver filed a claim against a former receiver for failure to perform the duties of receiver resulting in damage to the receivership estate. *Id.* at 667. The trial court entered judgment against the former receiver, and the Court affirmed the trial court, holding that "When the receiver steps outside his authority granted to him by the court, he cannot claim the protection of the court and he can be sued as an individual." *Id.* at 671. *See also INF Enter., Inc. v. Donnellon,* 133 Ohio App.3d 787, 729 N.E.2d 1221, 1222 (1999) (disallowing immunity in the face of an immunity statute in no wise different from Missouri's (*see* Ohio Rev. Code Ann. § 1125.33)). As the New York Court of Appeals has opined:

> Receivership by its very nature involves weighty responsibility, and the failure to discharge it cannot be excused because of inadvertence, neglect, insufficient diligence or a misapprehension of legal principles. If it is shown ... that the claim against the [r]eceiver arises by reason of some act or omission within the context of his official responsibilities as a[r]eceiver, the receivership property may be looked to for whatever damages plaintiff's may prove. However, if the plaintiff's claims against the [r]eceiver are occasioned by acts or omissions outside the purview of the court's orders to the [r]eceiver and the [r]eceiver is personally, as distinguished from officially, responsible in contract or tort then, since a suit against him personally would be justified, he may be surcharged in this action for such claims arising out of his defalcations, negligence, misfeasance or contract liabilities.

*149 Clinton Ave. N., Inc. v. Grassi,* 51 A.D.2d 502, 382 N.Y.S.2d 185, 189 (1976).

■ Immunity from personal liability extends only to those acts (or omissions) stemming from a judicial order, either expressly or implicitly, but not to breaches of

one's fiduciary duty to the court. *See Kinder v. Mo. Dept. of Corrs.*, 43 S.W.3d 369, 369 (Mo.App.2001). As a fiduciary, Sauer had a duty to exercise reasonable care, at a minimum. *See Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928).

*Avidan v. Transit Casualty Co.* doesn't help Sauer. 20 S.W.3d 521 (Mo. banc 2000). In *Avidan*, the receiver terminated an employee who then sued the Receiver under 42 U.S.C. § 1983. *Id.* at 523. The former-employee contended the termination was "willful, wanton, and malicious." *Id.* The trial court dismissed the action, finding the Receiver immune under § 375.650.2, which contained the "good faith" requirement, unlike § 375.1182.5. *Id.* at 524. Because § 375.1182.1(5) had not gone into effect yet, the court did not have to interpret § 375.1182.5. *Id.* at 525. The Court reversed because the former employee's petition alleged the Receiver acted in bad faith. *Id.*

The commentary in *Avidan* does not support Sauer's position. First and foremost, the comments about § 375.1182.1.5 were *obiter dicta. See id.* at 524 n. 4. The Court's *dicta* are not binding. *State ex rel. Anderson v. Hostetter*, 346 Mo. 249, 140 S.W.2d 21, 24 (1940). At most, they have persuasive force. *Id.* Furthermore, the Court's comments were about the absence of a "good faith" requirement in § 375.1182.1(5), not the range of acts covered. To get from the Court's off-the-cuff comments, in a case in which the Receiver's act, terminating an employee, was within the Receiver's power, *see State ex rel. Angoff v. Wells*, 987 S.W.2d 411, 415–16 (Mo.App.1999); § 375.954.3, to Sauer's conclusion requires an astounding leap of logic.

■ Immunity doesn't attach *unless* the SDR's acts or omissions fall within the ambit of the protections of § 375.1182.5. An agent's acts are within the scope of authority only if (1) the acts are done by virtue of the agency relation (2) to further the interests of the principal. *See Maryland Cas. Co. v. Huger*, 728 S.W.2d 574, 579 (Mo.App.1987). Sauer's alleged overcharging of the receivership was not motivated by a desire to further the interests of the principal.

## C. Did the court lack jurisdiction because its audit was *ultra vires* ?

■ Sauer concedes that § 375.1230 authorized the court to audit the SDR. But she argues that it doesn't countenance a managerial or performance audit, the kind rendered by the auditor; and that interpreting the statute as allowing a managerial audit might violate the separation of powers. MO. CONST. art. II, § 1. Sauer invokes the interpretive canon of constitutional avoidance, that when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the court's] duty is to adopt the latter." *Harris v. U.S.*, 536 U.S. 545, ——, 122 S.Ct. 2406, 2413, 153 L.Ed.2d 524 (2002). *See also Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 838–39 (Mo. banc 1991) (invoking doctrine not only where one interpretation raises "grave and doubtful constitutional questions" but also where one interpretation would be unconstitutional). Respondent retorts that the receivership system is one of shared power and that Missouri courts have never questioned its validity, making the canon inapplicable. Finding no support for Sauer's conflation of "audit" and "financial audit" and nothing prohibiting the judiciary from regulating its officers of the court, this court agrees with respondent. But we also find that, even if Sauer were correct, the surcharge hearing would still be valid.

■ Does § 375.1230 authorize a managerial audit? Under § 375.1230, the court may "cause audits to be made of the books of the receiver." The meaning of "audit" is a question of statutory interpretation, i.e., a question of law. *Carmack v. Mo. Dep't of Agric.*, 31 S.W.3d 40, 46 (Mo. App.2000). "Audit" is undefined by statute. Webster's describes an audit as "an examination of an account of or of accounts by proper officers or persons appointed for that purpose, who compare the charges with the vouchers, examine witnesses, and report the results." Webster's New Universal Unabridged Dictionary 123 (2d ed.1983). Black's Law Dictionary defines an audit as "[s]ystematic inspection of accounting records involving analyses, tests and confirmations." Black's Law Dictionary 131 (6th ed.1990). These definitions don't suggest the clear-cut distinction Sauer makes between financial and performance audits, nor rule out the latter. If "audit" *could only mean* "financial audit," then § 23.160.1, which uses the term "management audit," would be nonsense, for a "management audit" would necessarily mean a "management financial audit," a contradiction in terms. That § 23.160.1 was invalidated for violating the separation of powers, *see State Auditor v. Joint Comm. on Legislative Research,* 956 S.W.2d 228, 233 (Mo. banc 1997), presupposes it was not nonsense to define "audit" as a management audit (in which case a "management audit" could mean a "management management audit," a redundancy but meaningful nonetheless).

Though § 375.1230 does state that any court-instigated audit must be "of the books," Sauer doesn't explain why an audit "of the books" cannot inquire into the veracity of the items listed. No accounting experts are cited that define "audit" in a way that reduces the auditor to a mere cipherer.

■ Interpreting "audit" as countenancing a managerial audit wouldn't risk violating the separation of powers. *See* MO. CONST., art. II, § 1. Neither *State Auditor v. Joint Committee on Legislative Research,* 956 S.W.2d 228 (Mo. banc 1997), nor *Director of Revenue v. State Auditor,* 511 S.W.2d 779 (Mo. banc 1974), suggests the contrary. In the former, the Supreme Court of Missouri held that a legislative committee couldn't conduct a management audit of the state auditor, in whom the Missouri Constitution reposed sole authority to audit the executive branch. Here, the court didn't interfere with the *constitutional* authority of the Receiver to audit the SDR: the Receiver's power derived from statute, not the Constitution. Neither is the audit power here nearly as extensive as that in *Joint Committee;* in *Joint Committee,* the legislative committee could review entire agencies. 956 S.W.2d at 231. Here, the auditor is restricted to specific receiverships over which the court has specific statutory oversight authority. *See* § 375.1230. Also notable is that, unlike in *Joint Committee, see id.,* no public monies are used to pay for an audit. § 375.1230 ("The expenses of each audit shall be considered a cost of administration of the receivership.").

■ Most importantly, an SDR, unlike the state auditor, is not a purely executive agent. The SDR is an officer of the court. § 375.650.2. Historically, receiverships were initiated, supervised, and terminated by the courts under their equity powers. It must be remembered that the separation of powers doesn't create an impenetrable wall between the branches of government. *Chastain v. Chastain,* 932 S.W.2d 396, 398 (Mo. banc 1996). It is designed to prevent the concentration of unchecked power in one branch. *Dabin v. Dir. of Revenue,* 9 S.W.3d 610, 613 (Mo. banc 2000). Allowing the court to audit

one of its officers with the purpose of ascertaining whether the officer breached his (or her) fiduciary duties doesn't interfere with the Director of Insurance's administration of receiverships. On the contrary: the information a court-initiated audit turns up can only help the Department monitor an SDR's performance.

It is not an exercise of unbridled power for the court to order an audit of one of its officers, under a statute passed by the legislature, with the objective of determining whether the court needs to exercise its inherent powers to prevent unjust enrichment. The best reading of § 375.1230 is that the supervising court can order a performance audit or managerial audit of an SDR.

## II. SHOULD THE TRIAL JUDGE HAVE PRESIDED OVER THE TRIAL WHICH RESULTED IN A SURCHARGE?

 The emotions in this case ran high and the briefs ran long. To bring three somewhat similar points into better focus, the court has chosen to treat as one point Sauer's basic contention that the trial judge should not have presided over the August trial which resulted in the over $770,000 surcharge judgment against her. She asserts under Rule 51.05, as a party, she was entitled to an automatic change of judge in this civil action based on a timely application; or under Section 508.090 *et. seq.*, the judge was disqualified in this civil suit where she, as a party, showed she could not get a fair trial because of the bias, interest or prejudice of the judge; or under Rule 2.03 Canon 3(E)(1), the judge should have recused himself because his actions in this proceeding raised reasonable questions of his impartiality. A denial of a motion for change of judge is reviewed for an abuse of discretion, *State v. Ayers*, 911 S.W.2d 648, 651 (Mo.App. 1995), that is a mistaken finding clearly

contrary to the facts and circumstances— an act untenable and clearly against reason, working an injustice. *See Egelhoff v. Holt*, 875 S.W.2d 543, 549–50 (Mo.banc 1994).

### A. RULE 51.05 and CHAPTER 508

 As explained *infra*, the court finds that pursuant to the canon cited above, the judge should have recused for the surcharge hearing, which ruling results in a reversal and remand. Even though the court does not decide the case on the issues of the SDR procuring a change of judge for the hearing, several observations should be made as to the SDR's allegations for relief under Rule 51.05 for change, and chapter 508 for disqualification. As stated earlier, the style of the case under review reflects the very nature of the lawsuit—an action by the regulator, as statutory receiver to liquidate an insolvent insurance company. A hearing within that suit, which may result in a fiduciary being subject to a surcharge under the Insurance Insolvency Code, is not a typical standalone lawsuit and does not fit into the ordinary status of party's within a regular suit. The court observes the SDR, although later denominated as a defendant, is not and was not, made a *party* to the underlying suit (*Director v. USPM*); there is also a question as to whether a surcharge effort commenced within an insolvency proceeding, is even a *civil* action for purposes of invocation of the rule or *civil* suit for purposes of the statute. That a proceeding is not criminal does not necessarily make it a civil action. *(See Hayes v. Hayes*, 363 Mo. 583, 252 S.W.2d 323, 326–27 (1952)); *Capps v. Capps*, 715 S.W.2d 547, 552 (Mo.App.1986); the fact the judge who presided over the liquidation ordered an audit does not decide the issue of his or her bias or prejudice.

### B. RULE 2.03 CANON 3E.(1)

This brings the analysis to the SDR's bifurcated point that the canons applicable to judges required the court to recuse. Rule 2 covers the Code of Judicial Conduct. Canon 3 of Rule 2.03 states, "A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently." The applicable subsection states:

E. Recusal.

(1) A judge shall recuse in a proceeding which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . ."

The SDR contends Wells should have recused because of bias and prejudice and because his actions went counter to the canon's language of avoiding raising a reasonable question of impartiality.

The facts presented by the SDR in support of a recusal under this prong of the canon are summarized: the court's *ex parte* meetings and telephone conversations with counsel for the Receiver; numerous rulings and rulings on her motions, particularly for fees and costs which went against the SDR; ordering the audit and allowing audit costs to escalate into the hundreds of thousands of dollars; the court's comments rejecting Sauer's appointment for ProMed; the court's comments about holding the SDR in contempt and that her malpractice insurance should be paid up.

**1. Bias and Prejudice**

 "[A] disqualifying bias and prejudice is one with an extra[-]judicial source that results in the judge forming an opinion on the merits based on something other than what the judge has learned from participation in the case." *State v.*

*Cella,* 32 S.W.3d 114, 119 (Mo. banc 2000) (citing State v. Nicklasson, 967 S.W.2d 596, 605 (Mo. banc 1998)). *But see Liteky v. U.S.,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring [during] the current proceedings, or of prior proceedings, do not constitute a basis for bias or partiality motion, unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible"). Bias must stem from an extra-judicial source. *State v. Hunter,* 840 S.W.2d 850, 866 (Mo. banc 1992). Any information Judge Wells received from the auditor was not strictly extra-judicial. Sauer's citation to *Haynes v. State* is unavailing. 937 S.W.2d 199 (Mo. banc 1996). There, the Supreme Court of Missouri held that a trial court judge who had conducted a grand jury proceeding had an adversarial interest and,.thus, couldn't preside over the defendant's trial. *Id* at 202. That Judge Wells made rulings against Sauer was not grounds for disqualification. *See State v. Copeland,* 928 S.W.2d 828, 841 (Mo. banc 1996). Neither were Wells' harsh words—his admonition to Sauer to ensure that her malpractice insurance was paid up and his contempt threat. "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display [do not create bias]. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky,* 510 U.S. at 555–56, 114 S.Ct. 1147. *See also Haynes,* 937 S.W.2d at 204. That the comments were made during a hearing unrelated to the USPM receivership also weakens whatever prejudice-revealing force they might have. The inference made by Sauer is insufficient to require

recusal, for if Judge Wells was partial towards Campbell, a former SDR, the source of bias wasn't extra-judicial. *See City of Kansas City v. Wiley,* 697 S.W.2d 240, 243 (Mo.App.1985) (information acquired during an earlier proceeding doesn't stem from an extra-judicial source). In any event, another possible scenario is that Wells became aware of the investigation into Sauer's billing practices launched by a bar complaint.

Sauer's final salvo is that Judge Wells must have been biased against Sauer because the audit cost the USPM estate about $500,000. If the ordering of the audit required recusal, surely the Insolvency Code would say so. It doesn't. An audit is an inquiry, not an accusation. Just as a the court may ask questions of witnesses without *ipso facto* tainting itself, *see Abel v. State,* 737 S.W.2d 487, 488 (Mo.App.1987), so may a judge order an audit without risking disqualification. Judge Wells did nothing during the hearing indicating he was biased. Sauer was allowed to conduct discovery on the payment matters raised by the Receiver and on the issues raised by the audit. She was granted a continuance when it appeared she was unprepared for trial. Judge Wells assured her that he would compel attendance of witnesses from the Department. She presented her case, introduced hundreds of exhibits, and called witnesses without hindrance from Judge Wells. The Court did not abuse his discretion in refusing to recuse himself on the grounds of actual bias.

 A judge's impartiality might reasonably be questioned if a reasonable person would have a factual basis to doubt the judge's impartiality. *Graham v. State,* 11 S.W.3d 807, 813 (Mo.App.1999). "[A]lthough the court tries to make an external reference to a reasonable person, it is essential to hold in mind that these outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be." *In re Mason,* 916 F.2d 384, 386 (7th Cir.1990) (*cited in Robin Farms, Inc. v. Bartholome,* 989 S.W.2d 238, 248 (Mo.App.1999)). It must also be remembered that: " 'No system of justice can function at its best or maintain broad public confidence if a litigant can be compelled to submit [a] case in a court where the litigant sincerely believes the judge is … prejudiced.' " *State ex rel. Raack v. Kohn,* 720 S.W.2d 941, 943 (Mo. banc 1986) quoting *State ex rel. McNary v. Jones,* 472 S.W.2d 637, 639 (Mo.App.1971).

 Canon 3(E)(1) doesn't limit disqualification to instances of actual bias under subsection (a); other circumstances can compel recusal. *Robin Farms Inc.,* 989 S.W.2d at 246. *See also State ex rel. Wesolich v. Goeke,* 794 S.W.2d at 698 ("[A] judge's duty to disqualify is not confined to the factors listed … but is much broader."). Whether the circumstances warrant recusal because of an appearance of impropriety must be made on a case-by-case basis. *Robin Farms,* 989 S.W.2d at 246. The public's confidence in the judicial system is the paramount interest safeguarded by the canon. *Id.* at 247.

 It must be noted that Judge Wells' denial of Sauer's offer to resign and of her payment motions are irrelevant. Adverse rulings cannot serve as grounds for recusal. *Id.* at 247. Otherwise, a party could judge shop merely by filing bogus motions. Where rulings are improper, the remedy is to appeal.

Even so, the facts here created a reasonable question as to the judge's impartiality.

 To begin with, the extended *ex parte* meetings and conversations between the Court and the auditor are of concern. See Rule 2.03 Canon 3(B)(7). In light of

Judge Wells' comments, a reasonable layman might question the propriety of the meetings if indeed only substantive matters were discussed. To be sure, *"Ex parte* communications that are occasioned by the exercise of 'related judicial functions' do not stem from an extra-judicial source. A judge's *ex parte* communication occasioned by a related judicial function— for example, the judge's exercise of her administrative duties—is generally not deemed to provide a cognizable ground for judicial disqualification[.]" Richard E. Flamm, *Judicial Disqualification,* § 14.3.3 (1996). And in bankruptcy-type proceedings such as an insurance receivership, the prohibition on *ex parte* communication isn't so stringent. Flamm, *supra* at § 14.3.5. Still, the court had already delineated the nature the audit was to take. He had previously instructed the auditor to do: "(1) any accounting procedure to assess and evaluate the efficiency of all receivership personnel; (2) a review of all supporting documentation for time spent on all receivership affairs; (3) an analysis of the total cost to the receivership estate for execution of the partial distribution to Class 2 creditors upon application to this [c]ourt; and (4) an accounting of all receivership receipts and expenditures including examination of all supporting ·documentation." There was no need for *any* further communications with the auditor, except perhaps by modification of his initial order.

▄▄▄▄ These comments about Sauer's handling of the receivership matter are unimportant to the bias calculus. They don't stem from an extra-judicial source. *See Williams v. Reed,* 6 S.W.3d 916, 921 (Mo.App.1999) (actual bias must have extra-judicial source). They relate to Sauer's handling of a receivership over which Judge Wells had supervisory responsibilities. They are, however, germane to the appearance of impropriety inquiry, no matter what their source. *See Robin Farms,* 989 S.W.2d at 248 ("[I]t is irrelevant in determining whether there is an appearance of impropriety, whether the trial judge was actually biased or prejudiced against a party."). *See also Rogers v. Bradley,* 909 S.W.2d 872, 874 (Tex.1995) (judge's " 'impartiality might reasonably be questioned' regardless of the source or circumstances giving rise to the question of impartiality ..."). "Conduct or speech of a trial judge indicative of a belief as to the accused's guilt is the antithesis of impartiality. Acts or conduct [that] give the appearance of partiality should be avoided with the same degree of zeal as acts or conduct [that] inexorably bespeak partiality." *State v. Garner,* 760 S.W.2d 893, 906 (Mo.App.1988).

Both the timing and the content of Judge Wells' comments, in particular the malpractice comment, are also important.[12] The malpractice comment *preceded* the surcharge hearing. *Cf. Classe v. Classe,* 772 S.W.2d 386, 388 (Mo.App.1989) (harangue at end of trial, in which trial judge called defendant a liar and a "miserable human being," didn't merit disqualification); *State v. Jones,* 979 S.W.2d 171, 179 (judge's reprimand of counsel's for apparently making rambling objections to sway jury not grounds for disqualification). To a reasonable layman, it thus might indicate the hardening of the judicial mind against Sauer, a forming of prejudice. *See State v. Dodd,* 944 S.W.2d 584, 587 (Mo.App.1997) ("[A] judicial statement—on the record or off—that raises a genuine doubt as to the

---

12. *See* Leslie W. Abramson, *Appearance of Impropriety: Deciding When a Judge's Impartiality "Might Reasonably Be Questioned,"* 14 GEO. J. LEGAL ETHICS 55 (2000) (courts more likely to find appearance of impropriety when comments by judge precede trial, as opposed to comments made at end).

judge's willingness to follow the law, provides a basis for recusal of, if the judge refuses to recuse, reversal on appeal."). There had been no audit; there had been no hearing. It was made the day after he approved an interim payment to Sauer. As the court does not have knowledge of any new facts occurring between the two events, except Sauer's notification that the Director of Insurance had appointed wanted her to be SDR in the ProMed receivership That these comments came two years before the hearing before Wells somewhat mitigates their force, but given the ongoing dispute between the Director and Judge Wells, see State ex rel. Angoff v. Wells, 987 S.W.2d 411 (Mo.App.1999). The court also notes, in addition to the just mentioned facts, the decision here is buttressed by the trial court's attempt to talk to Receiver's counsel, the trial court's avoidance of ruling on the motions to recuse, the trial court's reluctance to allow Sauer to intervene and attain party status, and the belated attempt to assess costs and attorney's fees against the SDR.

The cumulative effect of the court's actions would lead a disinterested layman to conclude that there was a significant risk that Judge Wells could not be impartial. See Williams, 6 S.W.3d at 922–23 (in combination judge's questions and statements created appearance of impropriety); Hopfinger v. Kidder Int'l, Inc., 827 F.Supp. 1444, 1449 (W.D.Mo.1993). See also U.S. v. Whitman, 209 F.3d 619, 624–26 (6th Cir.2000) (judge who harangued defendant's counsel about his purported ethical lapses and who declared that his mission as federal judge was to "educate the bar" created appearance of impropriety); Sales v. Grant, 158 F.3d 768, 781 (4th Cir.1998) (snide comments and pre-trial statements that lawsuit seemed to lack merit and that jury had made mistake in deciding earlier case might have created an appearance of impropriety).

In State ex rel. McCulloch v. Drumm, 984 S.W.2d 555 (Mo.App.1999). In Drumm, the trial court judge denied the defendant's motion to waive a jury trial because he felt he couldn't be objective. Id. at 556. After the jury convicted the defendant, he said that he had denied the motion because he had seen psychiatric evaluations that diagnosed the defendant as having a mental disease or defect, and that he agreed with the evaluations. Id. After the defendant's conviction (for which the judge sentenced the defendant to life without possibility of parole) was reversed, the case was remanded to the same judge for retrial. Id. Thereafter, the judge who agreed to hear the State's motion for change of judge for cause denied the motion. Id. The judge granted defendant's motion to waive a jury trial. Id. at 557. A writ of prohibition was issued prohibiting the judge from hearing the case. Id. at 558. This court made the writ absolute on the grounds of an appearance of impropriety. Id. It should be kept in mind that there are only three grounds for issuance of a writ, Ferrellgas, L.P. v. Williamson, 24 S.W.3d 171, 175 (Mo.App.2000), and the only one applicable in Drumm was to remedy an abuse of discretion. Id.

There was insufficient evidence of actual bias. The question, though, is whether the judge's impartiality might reasonably be questioned, not whether the judge was, in fact, biased. Robin Farms, 989 S.W.2d at 247 (appearance of impropriety if there is "a shade of doubt or a lesser degree of possibility" that judge appears biased) (emphasis added); Molasky v. State, 710 S.W.2d 875, 878 (Mo.App.1986). See also In re Mason, 916 F.2d 384, 386 (7th Cir.1990) ("[D]rawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance

of impropriety standard ... into a demand for proof of actual impropriety.") As Justice Frankfurter observed, "When there is ground for believing that ... unconscious feelings may operate in the ultimate judgment, or may not unfairly lead others to believe they are operating, judges recuse themselves.... [T]he administration of justice should reasonably appear to be disinterested as well as be so in fact." *Public Utils. Com'n of D.C. v. Pollak*, 343 U.S. 451, 466–67, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). To maintain public confidence in the integrity of the judicial system, the courts adopt a liberal construction that favors the right to disqualify. *Robin Farms*, 989 S.W.2d at 247 (citing *State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692, 695 (Mo.App.1990)). Judges must "err on the side of caution by favoring recusal to remove any reasonable doubt [of] impartiality." *Id.* Such is the situation here. Even though the court was justifiably frustrated with the SDR, the court should have recused.

Based on a totality of the facts, this court holds that Judge Wells abused his discretion in refusing to recuse himself on the basis of an appearance of impropriety. Therefore, the judgment of the court will be reversed.

\* \* \*

Sauer's additional points have been rendered moot by the decision on recusal.

**CONCLUSION**

The trial court had the inherent power to surcharge Sauer. Because Judge Wells abused his discretion in failing to recuse himself under Rule 2.03, Canon 3(E)(1), however, the judgment must be reversed, and the case is remanded for trial before a different judge. Several matters, however, need to be set out to aid the trial court in conducting the new trial; Judge Wells had the jurisdiction to order the audit which was presented for court approval; Wells had the authority to receive in evidence and accept the contents of the audit; in this insurance insolvency proceeding the trial court has jurisdiction to assess a reasonable surcharge against a special deputy receiver who has been afforded proper due process and discovery rights; Sauer, if she so chooses, may again present her claim for an increased hourly rate for unreimbursed time spent as SDR prior to April 29, 1999; the Receiver will not be allowed to recover the audit costs and the attorney's fees because of his admission during oral argument that the fees had not been requested, an admission that is binding under the law of the case. *See St. Louis Union Trust Co. v. Conant*, 536 S.W.2d 789, 796 (Mo.App.1976); and, the issues raised in this appeal, and the court's rulings today, do not affect the designation of Judge Wells to preside over the winding up procedure of USPM.

Sauer's motion for sanctions under Rule 55.03 is denied. The judgment for surcharge is reversed and the cause is remanded pursuant to the directions outlined in this opinion.

NEWTON, J., concurs.

SMART, J., concurs in separate concurring opinion.

JAMES M. SMART, JR., Judge, concurring.

I concur with the principal opinion, which is quite thorough in taking us through some new and difficult issues. But because this appeal so directly raises a challenge to the objectivity of Judge Wells, who has not spoken for himself with regard to the proceedings below, I write separately to state a slightly different perspective of the court's actions in their factual context. Part of that context emerges

from the background of *State ex rel. Angoff v. Wells,* 987 S.W.2d 411 (Mo.App. 1999), which involved the conflict between Judge Wells and Jay Angoff, the Director of the Department of Insurance, over the issue of the authority of the Director to terminate the special deputy receiver of ProMed without the approval of the court. That case, clearly, involved more than a difference of opinion concerning an issue of law. To understand, we must go back to the Director's attempt to name Ms. Sauer as SDR of ProMed.

By spring or early summer of 1998, Judge Wells surely knew that a bar association investigation, and an FBI investigation, had been launched into Elisabeth Sauer's billing practices in the USPM receivership as a result of an accusation apparently made by an office worker.[1] Although such investigations are confidential, the investigation could hardly be conducted without the knowledge of the judge supervising the receivership in question. Moreover, Judge Wells would have assumed that the Director knew about the investigation. This sheds much light on Judge Wells' reaction when, in June 1998, he learned, to his obvious irritation, that Ms. Sauer was being named SDR of yet another receivership estate, ProMed. Because Ms. Sauer was the messenger bearing the news of the Director's intention to appoint her in place of the acting SDR, the Judge's reaction surely had nothing to do with any inherent bias against Elisabeth Sauer, or any favoritism toward the acting SDR, but was an expression of his frustration with the Director.

Judge Wells consistently fought against allowing the Director to unilaterally remove an SDR. He fought it with regard to the ProMed receivership, and he also fought it with regard to the removal of Ms.

Sauer, even though he had already accused her of improprieties. His actions reflect specifically his desire to retain jurisdiction, and his distrust and dissatisfaction with the Director.

Having learned that there were specific allegations of billing irregularities against Ms. Sauer, and believing he had a responsibility as the judge supervising the receivership, Judge Wells ordered the audit pursuant to Section 375.1230. Because the Director expressed no concerns about any fiduciary breaches until *after* the entire audit had charged significant improprieties, the Judge obviously felt that he could not count on the Director to take aggressive action in behalf of the receivership. The Judge also faced the same problem we face in reviewing this matter: there is not much authority available on the proper role of the receivership judge in relation to an audit and surcharge hearing.

As for the issue of recusal, it should be remembered that receiverships are complicated undertakings, and that Judge Wells had much acquired knowledge concerning the entire matter. There would have been some loss of knowledge by turning the matter over to another judge. Also, as already noted, the court certainly viewed itself as having to take on to some extent the prosecutorial role, including taking precautions to ensure that the auditor had the chance to interview witnesses confidentially. That does not mean the Judge should not have recused himself; it simply means there were reasons in the court's mind for not doing so. It also fits with the notion that, regardless of how his actions might have appeared to Ms. Sauer, Judge Wells is entitled to the presumption that his actions were born not of bias, but of a commitment to do his duty as he saw it.

---

**1.** Our record does not disclose the outcome of these investigations, but there is no indication that any indictment or disciplinary action was taken against Ms. Sauer.

The meetings of Judge Wells with the auditor outside of Ms. Sauer's presence were not improper to the extent that they related to the procedure of the audit and to the extent that the court believed the confidentiality of the procedure must be maintained in order to achieve a reliable result. There is no showing that these meetings went beyond issues of audit procedure. Also, in evaluating the contacts between Judge Wells and the attorney for McPherson, the Acting Director (who replaced Angoff), it must be remembered that receivership judges routinely engage in exclusive communications with receivers and their deputies. Although under the circumstances here those contacts may have had an unfavorable appearance, again there is no evidence of ill motives.

Regardless of motives, however, I agree that the accumulated circumstances required more sensitivity on the part of the court to the issue of appearance. I think it is now clear that where the judge has been active in directing the course of the audit of the accused fiduciary and has made clear that he is driven by suspicion of the fiduciary's wrongdoing, there are strong reasons for the receivership judge to turn the surcharge hearing over to another judge. For the foregoing reasons, I concur in the ruling that Judge Wells should have recused himself from the surcharge proceedings on the audit.